Russell FARRIN et al., Plaintiffs

v.

MAINE SCHOOL ADMINISTRATIVE
DISTRICT NO. 59, Defendant

No. CIV. 01–43–B–S.

United States District Court,
D. Maine.

Oct. 10, 2001.

Richard L. O'Meara, Murray, Plumb & Murray, Krista N. Everly, Murray, Plumb & Murray, Portland, ME, for Plaintiffs.

Eric R. Herlan, Drummond, Woodsum & Macmahon, Portland, ME, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGAL, District Judge.

Plaintiffs Russell Farrin and Barbara Farrin, on behalf of their son Jacob Farrin, appeal a hearing officer's Special Education Due Process Hearing Decision issued pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (the "IDEA" or the "Act"), and the Special Education provisions of the Maine Revised Statutes, 20-A M.R.S.A. § 7001 *et seq.* (the "Maine Statutes"). Pursuant to the Court's Findings of Fact and Conclusions of Law stated below, the Court AFFIRMS the hearing officer's decision.

## I. OVERVIEW OF THE IDEA AND MAINE STATUTES

### A. Background of the IDEA

Congress enacted the IDEA to ensure that children with disabilities receive a "free appropriate public education" (or "FAPE"). *See* 20 U.S.C. § 1401(d)(1)(A). FAPE consists of special education and related services that are provided to children with disabilities at public expense and under public supervision during preschool, elementary school and secondary school. *See id.* at § 1402(8). The states and "local educational agencies" located within them are saddled with the responsibility of ensuring that children with disabilities receive FAPE.[1] *See id.* at § 1412–13. In return, the states receive funds from the federal government for use in implementing the provisions of the Act. *See id.* at § 1412(a).

---

1. The IDEA defines a local educational agency, in relevant part, as:

 a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school counties as are recognized in a State as an administrative agency for its public elementary or district, or other political subdivision of a State, or for such combination of school districts or secondary schools.

 *See* 20 U.S.C. § 1402(15).

A "pupil evaluation team" (or "PET") [2] consisting of a disabled child's parents, teachers, school administrators, and others who know the child well, oversees the child's special education. *See id.* at § 1414(d); 20–A M.R.S.A. § 7202(10); 05–071–101 Code Me. R. §§ 8.1–8.11. The PET meets annually, and more often if necessary, to develop an "individualized educational program" (or "IEP") outlining the special education services the child should receive. *See* 20 U.S.C. § 1414(d). Teacher and parent input and the results of a formal evaluation of the child conducted by the local educational agency inform the PET's decision-making. *See id.* at § 1414(d)(3). A formal evaluation must be conducted at least once every three years. *See id.* at § 1414(a)(2).

## B. The IDEA's Disciplinary Provisions

If a child with a disability misbehaves in school, the IDEA provides detailed procedures that the local educational agency must follow to suspend or expel him. To begin with, the Act gives "school personnel" the unilateral power to suspend a child with a disability for up to ten days as they would a non-disabled child—that is, without providing the child with an "alternative educational setting" (such as out-of-school tutoring). *See* 20 U.S.C. § 1415(k)(1)(A)(i). In Maine, school boards vested with the statutory power to oversee the operation of school administrative districts can give this power to a school principal. *See* 20–A M.R.S.A. § 1001(9–B).

If a child with a disability brings drugs or weapons to school, then the IDEA authorizes school personnel to "remove" the student to an "interim alternative educational setting" for up to an additional forty-five days. *See* 20 U.S.C. § 1415(k)(1)(A)(ii). Maine vests this removal power in the school board of the administrative district in which the school sits. *See* 20–A M.R.S.A. § 1001(9–B). This forty-five day removal typically occurs after the initial ten-day suspension mentioned above. *See* 64 Fed.Reg. 12,620 (Mar. 12, 1999).

Recognizing that schools have their own disciplinary rules applicable to all students, the IDEA also permits a school to discipline a child with a disability for more than ten days as it would discipline a non-disabled child, provided the disabled child's misbehavior was not a "manifestation" of his disability. *See* 20 U.S.C. § 1415(k)(5)(A). This power to "long-term suspend" a child comes into play when children with disabilities commit offenses that are not covered by the IDEA's forty-five day suspension provisions (that is, that do not involve drug or weapon possession), or in cases like this one, in which the forty-five day suspension is not adequate punishment.

Therefore, a child with a disability caught bringing drugs to school may be subject to the following disciplinary measures. First, he may be immediately suspended from school, without alternative educational services, for up to ten days. *See id.* at § 1415(k)(1)(A)(i). Second, he may serve an *additional* forty-five day suspension, during which time the school must provide him with alternative educational services. *See id.* at § 1415(k)(1)(A)(ii). Third, in addition to *or* in place of the forty-five day suspension under the IDEA, he may be suspended or expelled from school under generally applicable school disciplinary rules, *provided*

**2.** Under the federal scheme, the PET is known as an "IEP team." *See id.* at § 1414(d)(1)(B).

his behavior was not a manifestation of his disability. *See id.* at § 1415(k)(5)(A). Note that there is the possibility of overlap between the IDEA's forty-five day suspension provisions and generally applicable school rules. The functional difference between the two disciplinary measures (aside from their duration) is largely semantic, however, due to the procedural protections in place for children with disabilities who are removed from school for more than ten days.

Whenever discipline results in a child with a disability being kept out of school for more than ten consecutive days, either pursuant to the IDEA or generally applicable school rules, a so-called "change of placement" has occurred. *See* 34 C.F.R. § 300.519. When this happens, an additional set of procedural protections kicks in to protect the child. First, no later than the day the decision to change the placement is made, the child's parents must receive written notice of the decision and their procedural rights. *See* 20 U.S.C. § 1415(k)(4)(A)(i). The parents' procedural rights include the right to appeal the decision to a hearing officer and the right to appeal the hearing officer's decision to federal court. *See generally id.* at § 1415(d)(2).

Second, as of the eleventh day of suspension (i.e. the change of placement), the school must provide the child with an alternative educational setting. *See id.* at § 300.520(a)(1)(ii). The setting must be sufficient to allow the child to "continue to progress in the general curriculum." *See* 20 U.S.C. § 1415(k)(3)(B); *id.* at § 300.522. There is no hard-and-fast rule as to what specific educational services need to be provided in an alternative setting. Rather, the comments appended to the IDEA's implementing regulations defer to state and local definitions of "gener-

al curriculum" for guidance. *See generally* 64 Fed.Reg. 12,623 (March 12, 1999).

Third, within ten days of the decision to change the child's placement, the PET must convene to determine if the behavior was a manifestation of the child's disability. *See* 20 U.S.C. § 1415(k)(4)(A)(ii). The PET may consider evidence not only of the child's identified disability, but also of any alleged disability that has yet to be identified in the child. *See Richland Sch. Dist. v. Thomas P.*, No. 00–C–0139–X, 2000 U.S. Dist. LEXIS 15162, at *25–28 (W.D.Wis. May 24, 2000); 64 Fed.Reg. 12,625 (March 12, 1999). A finding that the behavior was not a manifestation clears the way for the school to discipline the child pursuant to generally applicable school rules. *See id.* at § 1415(k)(5)(A). If the PET decides the behavior *was* a manifestation, however, then the generally applicable rules cannot be applied to the child. *See id.* Nevertheless, a child who was suspended under the IDEA for bringing drugs or weapons to school must serve the entire forty-five days of his suspension, notwithstanding the result of the manifestation determination. *See, e.g.,* 64 Fed.Reg. 12,626 (Mar. 12, 1999).

Finally, within ten days of the change of a child's placement, the child's PET must meet to perform a "functional behavior assessment." *See* 20 U.S.C. § 1415(k)(1)(B); 34 C.F.R. § 300–520. The purpose of the functional behavior assessment is to explore the child's misbehavior and discover what, if anything, can be done to address it and prevent it from occurring again. *See generally* 64 Fed.Reg. 12,618 (March 12, 1999); Turnbull, *IDEA, Positive Behavioral Supports, and School Safety,* 30 J.L. & Educ. 445, 456–58 (2001). After completing the assessment, the PET will apply the results in developing a "behavioral intervention plan" detailing the procedures school personnel should use in

guiding the student towards more appropriate behavior. *See* 20 U.S.C. § 1415(k)(1)(B); 34 C.F.R. § 300.520(b).

## C. The IDEA's Procedural Protections for Parents and Students

The IDEA gives a disabled child's parents a number of procedural rights intended to ensure their participation in the development of their child's program and placement. *See generally* 20 U.S.C. § 1415(b). In particular, the parents have a right to request a "due process hearing" to challenge the adequacy of their child's IEP, the result of a manifestation hearing, or the school's decision to take disciplinary action. *See id.* at § 1415(f); 1415(b)(6); 1415(k)(6). In Maine, a hearing officer conducts the due process hearing by receiving oral and written evidence. At the close of evidence, the officer renders Findings of Fact and Conclusions of Law. *See* 101 Me. Spec. Ed. Reg. § 13.1 *et seq.;* 14.1 *et seq.* If the parents wish, they may appeal the officer's decision to a federal district court. *See* 20 U.S.C. § 1415(i)(2).

While an appeal by the parents is pending, a child with a disability who has been suspended or expelled from school may "stay put" in his "current educational setting" (i.e., in school). *See id.* at § 1415(k)(7). However, a child suspended for drug or weapon possession under the IDEA's forty-five day rule must serve out his suspension in an alternative educational setting, even pending an appeal of the suspension. *See id.*

## II. STANDARD OF REVIEW

 The Court's scrutiny of a hearing officer's decision falls short of de novo review. *See, e.g., Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 994 (1st Cir. 1990). The IDEA instructs the reviewing court to receive the records of the administrative hearing, hear any additional evidence at the request of a party, and, basing its opinion on the preponderance of the evidence, grant such relief as the court determines is appropriate. *See* 20 U.S.C. § 1415(i)(2)(B). However, this grant of jurisdiction "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *See Lenn v. Portland Sch. Comm.,* 998 F.2d 1083, 1086 (1st Cir.1993) (internal quotations omitted). Rather, the Court's role in reviewing a hearing officer's decision is one of "involved oversight," giving "due weight" to the expertise of the administrative agency. *See id.* at 1087; *Roland M.,* 910 F.2d at 989–90.

 To implement this intermediate level of review, the Court has adopted a three-step process:

First, the Court carefully reviews the record of the due process hearing. Second, appropriate deference is given the Hearing Officer and his expertise, particularly with regard to factual determinations. Finally, the Court makes an independent decision whether the hearing officer's determination is supported by a preponderance of the evidence.

*See Greenbush Sch. Comm. v. Mr. and Mrs. K.,* 949 F.Supp. 934, 938 (D.Me.1996). When questions of law are also presented, the Court makes an independent determination whether the requirements of the IDEA have been met. *See, e.g., Bd. of Ed. of Hendrick Hudson Sch. Dist. v. Rowley,* 458 U.S. 176, 208, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The party appealing the hearing officer's decision bears the burden of demonstrating that his findings were erroneous. *See Roland M.,* 910 F.2d at 995. In this case, therefore, the burden rests with Plaintiffs.

 When the crux of an appeal is a procedural blunder by a school in applying

the IDEA, a harmless error standard applies. The Court must ask whether the misstep impacted the child's access to FAPE, hampered his parents' ability to participate in developing the child's program and placement, or caused a loss of educational benefits. *See id.* at 994. If the preponderance of the evidence does not support such a finding, then the Court may conclude that the school's procedural error was without effect and deny relief. *See id.; Logue v. Shawnee Mission Pub. Sch. Unified Sch. Dist. No. 512,* 959 F.Supp. 1338, 1349 (D.Kan.1997).

Applying this standard, the Court outlines its Findings of Fact and Conclusions of Law below.

## III. FINDINGS OF FACT

### A. The Parties

1. Plaintiffs Russell Farrin and Barbara Farrin are the parents and legal guardians of Jacob Farrin, and are residents of Madison, Maine.

2. In 2000, Plaintiff Jacob Farrin was fourteen years old and an eighth-grade student at Madison Junior High School (the "School"), located in Madison, Maine.

3. Defendant Maine School Administrative District No. 59 ("MSAD No. 59") is the local educational agency that administers the School. The School Board is its governing body.

4. M.S.A.D. No. 59 is responsible for providing special education services to students at the School and all other schools under its control.

### B. Jacob's Learning Disability

5. Jacob is a student with a learning disability eligible for special education services pursuant to state and federal law.

6. During the 1997–98 school year, his fifth-grade year, Jacob's teachers noticed he was struggling to master language-based skills such as reading, writing and speech.

7. In the spring of 1998, M.S.A.D. No. 59 conducted an evaluation to determine whether Jacob was eligible for special education services.

8. The bulk of the evaluation addressed deficiencies in Jacob's language abilities. However, one battery of tests, known as a "Burks Behavior Scale," took stock of Jacob's behavioral patterns as well.

9. The Burks test revealed a tendency for Jacob to act impulsively and to become frustrated when confronting his disability. The evaluator noted "slight behavioral concerns," and recommended strategies for teachers to head off Jacob's frustration and anger in the classroom. *See* Record at 129.

10. The results of the evaluation indicated that Jacob was eligible for special education services.

11. After the evaluation, Jacob's PET developed an IEP for his sixth grade year.

12. There is no evidence in the record that the sixth grade IEP contained a behavioral component, or treated Jacob as having a disability that caused him to act impulsively.

13. During his sixth-grade year, Jacob's parents requested that further evaluations be conducted of Jacob's language abilities. A specialist performed new tests and made additional educational recommendations.

14. There is no evidence in the record that the Farrins' request reflected a concern about Jacob's behavior.

The new tests did not address any tendency on Jacob's part to act impulsively.

15. In the spring of 1999, Jacob's PET convened for the annual revision of his IEP, preparing for his seventh-grade year. Neither Jacob's parents nor his teachers appear to have raised Jacob's alleged tendency to act impulsively as a concern.

16. In the spring of 2000, Jacob's PET convened for the annual revision of his IEP in preparation for his eighth-grade year.

17. The eighth grade IEP addressed Jacob's "lower reading and writing skills." It provided for a program of daily supplemental English and reading exercises conducted by a "special education teacher," and a weekly consultation with a speech specialist. *See* Record at 78.

18. The IEP also permitted Jacob "special considerations" in his other core classes. A special consideration is a privilege, such as having extra time to take tests, given to a student to compensate for any disadvantage he might experience in his classes due to a language disability. *See id.*

19. The eighth-grade IEP did not address any aspect of Jacob's behavior, other than indicating that he would be "held accountable to regular discipline consequences for school and bus behavior." *See id.* at 79.

20. Jacob completed seventh grade in the spring of 2000 with a B+ average, earning A or B grades in all of his classes.

21. A little over one month into Jacob's eighth-grade year, Jacob's academic performance began to decline, his grades dropping to the C and D range.

22. In early October of 2000, Jacob's parents requested that the PET reconvene to address the decline in Jacob's academic performance.

23. On October 26, 2000, the PET met to discuss the parents' concerns. Jacob and his mother were present. At the meeting, Jacob attributed his lack of effort in several classes to being tired from playing football. He acknowledged that he needed to work harder, and that the special considerations he received in his classes were generally adequate.

24. Aside from a teacher's comment that Jacob appeared sleepy and disinterested in one class, nothing in the record indicates that there was any discussion at the October 26, 2000 PET of any concerns the PET had about Jacob's behavior.

25. No significant changes were made to Jacob's IEP as a result of the October 26, 2000 PET.

26. Jacob's school principal referred to him as a "role model for other students." *See* Hearing Testimony at 203. In school, Jacob was bright, personable and popular with his peers. He participated in scholastic sports and other extracurricular activities.

27. With the exception of the two incidents highlighted below, Jacob obeyed school rules and verbally encouraged his classmates to do the same.

28. Both Jacob's mother and a family friend described Jacob as impulsive and prone to having poor judgment. However, they acknowledged that this behavior, to the

extent it existed, manifested itself largely outside of school.

## C. The Alcohol Incident

29. In the fall of 1999, during his seventh-grade year, Jacob was disciplined for his participation in a drinking incident in which Jacob and several football teammates were caught drinking beer. He was suspended for fewer than ten days as a result of his involvement in the incident.

30. No PET meeting was called as a result of the beer drinking incident, nor did the Farrins request one. Jacob's principal characterized the incident as a "group" offense. *See* Hearing Testimony at 222.

## D. The Marijuana Selling Incident

31. On or about October 18, 2000, Jacob brought marijuana to school.

32. During a study period, Jacob arranged for another classmate to sell some of the marijuana to a third student.

33. Jacob gave the marijuana to the classmate, and the classmate, acting as a middleman, conducted the sale in a school bathroom.

34. Later, Jacob met the middleman in the bathroom and received $4.50 in proceeds from the sale and the remainder of the marijuana from him.

35. The sequence of events, from bringing the marijuana to school to ultimately receiving the remainder of the marijuana and the sale proceeds, took place over the course of several hours.

36. The events of October 18th did not come to light for several weeks. They had not been revealed as of October 26th, the date that Jacob's

PET addressed his academic troubles.

## E. M.S.A.D. No. 59's Disciplinary Actions Against Jacob

37. On November 3, 2000, the School's principal, Mark L. Campbell, called Jacob into his office and confronted him with evidence of the narcotics transaction. Jacob admitted to his involvement in the drug sale.

38. Mr. Campbell immediately suspended Jacob from school for ten school days, beginning Monday, November 6, 2000.

39. By letter dated November 10, 2000, Mr. Campbell formally informed Jacob's parents of the ten-day suspension. The letter also indicated that Jacob would have to appear before the School Board for a disciplinary hearing. The letter did not mention the Farrins' procedural rights.

40. Sometime before the School Board hearing, Jacob's parents met with Mr. Campbell. During the meeting there was some discussion about the additional punishment Jacob could receive beyond the ten-day suspension, although the participants did not reach a clear understanding. Specifically, Mr. Campbell did not indicate to the Farrins that he would recommend that the School Board expel Jacob.

41. On Monday, November 20, the evening prior to Jacob's eleventh day of suspension, the School Board met and, pursuant to Mr. Campbell's recommendation, voted to expel Jacob for the remainder of the school year.

42. The School Board did not specifically vote to suspend Jacob under

the IDEA's forty-five day suspension provision for drug offenders.

43. Both parents attended the School Board meeting, and at least one parent verbally participated in it.

44. The School Board did not have Jacob's special education file before it during the November 20th meeting, although at the meeting several people made the Board aware that Jacob was disabled and that a manifestation review would have to be held.

45. Jacob began serving his expulsion the next day, Tuesday, November 21, 2000.

46. On November 21, 2000, the School's special education director, Irene Christopher, contacted Mrs. Farrin to schedule Jacob's manifestation review. They discussed possible dates but did not settle on one.

47. During the next week, Ms. Christopher made several more attempts to contact the Farrins to schedule the manifestation review within ten days of the School Board meeting, but to no avail.

48. Mrs. Farrin, who was able to recognize the identity of a caller before answering the telephone with a "caller ID" device, admits to avoiding telephone calls from the school that week.

49. On November 28, 2000, Ms. Christopher sent a letter to the Farrins scheduling the manifestation review for December 11, 2000, a date twelve school days after the School Board meeting.

50. On November 29, 2000, the Farrins requested a due process hearing from the Maine Department of Education to contest Jacob's expulsion.

51. During the entire period from November 21, 2000, until the manifestation review meeting on December 11, 2000, Jacob received out-of-school tutoring from a special education tutor for two hours per day. During this time, Jacob did not receive the special reading instruction that the eighth-grade IEP mandated.

52. On December 11, 2000, Jacob's PET met to conduct a manifestation review.

53. The Farrins attended but did not actively participate in the meeting, maintaining that the manifestation review and Jacob's expulsion were illegal.

54. Notwithstanding the Farrins' objections, Ms. Christopher pressed ahead with the meeting, and the school personnel present determined that the drug-selling incident was not a manifestation of Jacob's disability.

55. In making its determination, the PET did not consider the results of the Burks test that had been conducted in 1998. The test results had been mistakenly excluded from the materials the PET reviewed.

56. The PET also adopted an "expulsion IEP" at the December 11, 2000 meeting. The expulsion IEP supplanted Jacob's regular school curriculum and IEP with two hours per day of at-home, one-on-one instruction in his core courses (reading, English, science, geography and mathematics), and two hours per week of one-on-one specialized reading instruction. No provisions were made for replacing Jacob's physical education, art or computer courses.

57. By informal arrangement, the Farrins and Jacob's special education teachers agreed that Jacob would receive make-up reading instruction to compensate for the instruction he had not received from November 21st through December 11th.

58. Finally, the PET attempted to arrange for an outside consultant to compile the information necessary to complete a functional behavioral assessment of Jacob. The Farrins refused, insisting that the PET perform the task itself.

59. To date, neither the PET nor an outside evaluator has performed a functional behavioral assessment of Jacob.

60. On December 12, 2000, Jacob's parents requested an additional due process hearing to challenge the legality and results of the manifestation review.

61. The Maine Department of Education appointed Peter H. Stewart, Esq., as the hearing officer for both due process cases. He convened a hearing on January 3, 2001. The hearing record remained open until January 10, 2001.

62. In testimony, Defendant's witnesses rejected the notion that Jacob's behavior was a manifestation of his disability, even assuming the disability included a tendency to act impulsively.

63. On January 5, 2001, Jacob returned to school under the IDEA's "stay put" provisions, having served forty-five days of his expulsion.

F. The Hearing Officer's Determination

64. On February 19, 2001, the hearing officer rendered his decision. His findings were as follows:

a. The IDEA and its corresponding regulations did not require that a manifestation review be held prior to a decision to expel a child with a disability under local educational agency rules.

b. The delay in holding the manifestation review did not affect Jacob's access to FAPE or his parents' ability to participate in the development of his IEP. Moreover, the Farrins' refusal to cooperate with Ms. Christopher's scheduling efforts significantly contributed to the delay.

c. M.S.A.D. No. 59 carried its burden of showing that the evidence supported the PET's determination that Jacob's behavior was not a manifestation of his disability. Specifically, "there was no credible connection established" between Jacob's previously identified language disability and the "impulsivity" that the Farrins insist Jacob exhibits. *See* Hearing Officer's Decision at 19.

d. The "expulsion IEP" provided Jacob with FAPE. Although Jacob would not be receiving art, computer and physical education instruction, he would still be able to "appropriately progress in the general curriculum." *See id.* at 22.

e. The "stay put" provisions of the IDEA did not apply to Jacob for the first forty-five days of his expulsion.

65. The hearing officer specifically did not address the following points:

a. Whether the PET's failure to consider the Burks test results as evidence of Jacob's alleged "im-

pulsivity" was fatal to the manifestation determination review.

 b. Whether M.S.A.D. No. 59's alleged failure to provide the Farrins with notice of Jacob's impending change of placement invalidated the School Board's expulsion decision.

 c. Whether the PET's failure to conduct a functional behavioral assessment within ten days of Jacob's expulsion was fatal to the manifestation determination review.

66. On March 1, 2001, the Farrins appealed the hearing officer's decision to this Court.

## IV. DISCUSSION

The Plaintiffs have asserted a variety of claims challenging the disciplinary action taken against Jacob. The claims can be broken down into three distinct categories: procedural defects in conducting the manifestation review; substantive disagreement with the outcome of the manifestation review; and other procedural defects. The Court will briefly discuss the claims and the legal arguments surrounding each.

### A. The Alleged Procedural Defects in the Manifestation Review

#### 1. The Sequencing of the Manifestation Review and the Expulsion Decision

As the Court finds above, Jacob's PET convened to conduct a manifestation review twelve school days *after* the School Board meeting. Plaintiffs argue strenuously that the PET should have conducted the manifestation review *prior to* the School Board meeting. To support their claim, they rely heavily on the distinction between discipline under the IDEA's forty-five day rule, 20 U.S.C. § 1415(k)(1)(A)(ii), and discipline under a

school's own generally applicable disciplinary rules.

Two sections of the IDEA shape this question. Section 1415(k)(4)(A), which specifically governs when a manifestation review must be held for a child whose placement has been changed, reads, in pertinent part:

(A) IN GENERAL—If a disciplinary action is contemplated [under the forty-five day suspension rule, 20 U.S.C. § 1415(k)(1)(A)(ii) ], for a behavior of a child with a disability described in [that paragraph—i.e., drug or weapon possession], or if a disciplinary action involving a change of placement for more than 10 days is contemplated for a child with a disability who has engaged in other behavior that violated any rule or code of conduct of the local educational agency that applies to all children—

(ii) immediately, if possible, but in no case later than 10 school days after the date on which the decision to take that action is made, a review shall be conducted of the relationship between the child's disability and the behavior subject to the disciplinary action.

*See also* 34 C.F.R. § 300.523(a). Thus, a disabled child suspended for drug or weapon possession under the IDEA's forty-five day provision, *or* a disabled child whose placement is changed under a generally applicable school rule for *some other* behavior that is not drug or weapon related, is entitled to a manifestation review *after* the decision to change the child's placement is made. There is plainly no explicit provision in the above quoted section for when a manifestation review should be held for a child with a disability who commits a drug or weapon offense and whose placement is changed pursuant to generally applicable school disciplinary rules.

Plaintiffs contend that section 1415(k)(5) of the IDEA controls in the interstices. It reads:

> if the result of a [manifestation determination review] is a determination ... that the behavior of the child with a disability was not a manifestation of the child's disability, the relevant disciplinary procedures applicable to children without disabilities may be applied to the child in the same manner in which they would be applied to children without disabilities...

20 U.S.C. § 1415(k)(5)(A). Plaintiffs interpret the language of this section to require that a manifestation review be held *prior to* the decision to change the placement of a child with a disability in Jacob's situation. That is, they argue that since section 1415(k)(4) does not explicitly provide for the case in which a child with a disability's placement is changed for a drug or weapon offense pursuant to generally applicable school rules, section 1415(k)(5)(A) should govern, and the manifestation review should precede the decision.

 Several basic canons of statutory construction guide the Court's analysis of Plaintiffs' argument. "Wherever possible, statutes should be construed in a common-sense manner, avoiding absurd or counter-intuitive results." *See Petitioning Creditors of Melon Produce, Inc. v. Braunstein,* 112 F.3d 1232, 1237 (1st Cir.1997) (citing *U.S. v. Carroll,* 105 F.3d 740, 744 (1st Cir.1997)); *Reich v. Bath Iron Works Corp.,* 42 F.3d 74, 78 (1st Cir.1994). Specific sections of statutes should be interpreted with reference to the statute as a whole, taking into consideration the objects and policy of the law. *See Pejepscot Indus. Park, Inc. v. Maine Cent. R. Co.,* 215 F.3d 195, 201 (1st Cir.2000). Perhaps most importantly, "[t]he meaning of statutory language, plain or not, depends on

context." *See U.S. v. Rivera,* 131 F.3d 222, 225 (1st Cir.1997).

 Applying these canons, the Court finds that Plaintiffs' reading of the two sections of the Act would create an arbitrary distinction between children with disabilities who are suspended under generally applicable school disciplinary rules for drug and weapon offenses and those suspended for other offenses. The Act entitles a child with a disability whose placement is changed under generally applicable school rules for a non-drug or weapon offense to a manifestation review within ten days after the disciplinary decision. *See* 20 U.S.C. § 1415(k)(4)(A). Plaintiffs would have it that a disabled student whose placement is changed pursuant to the same school rules, but who committed a drug or weapon offense instead, would have the benefit of a manifestation review *before* the disciplinary decision.

The Court does not see why such a distinction should be made. Congress, in writing the forty-five day provision into the IDEA, specifically contemplated that drug and weapon offenders would have the same entitlement to a manifestation review as non-drug and weapon offenders. *See id.* That a school decides not to invoke the IDEA's forty-five day provision in changing the placement of a child with a disability, or invokes the provision but adds additional time to the child's punishment by enforcing generally applicable school rules, should not change that result. Functionally, punishments under the forty-five day provision and under generally applicable school rules are the same. *See* 34 C.F.R. § 300.520(a)(1)(ii). Giving a child disciplined under one of them a procedural protection that he would not have under the others is simply not a reasonable interpretation of the statute.

Moreover, the Court is not convinced that the section of the Act upon which

Plaintiffs rely necessarily mandates a particular sequence. Section 1415(k)(5)(A) instructs that if the manifestation review results in a finding that the offense the child commits is not a manifestation of the child's disability, the disciplinary procedures applicable to all children "may be *applied*" to the child with a disability. 20 U.S.C. § 1415(k)(5)(A) (emphasis added). While Plaintiffs' sequential reading is not implausible, it is also reasonable to read the word "applied" to mean "enforced," or "carried out." In light of the arbitrary distinction that would result from Plaintiffs' reading of the statute, this latter interpretation of the statute is preferable.

### 2. The Delay in Holding the Manifestation Review

Plaintiffs also argue that the manifestation review should have occurred within ten school days of the decision to expel Jacob, rather than twelve. Defendants concede that ten days is the applicable time limit, and that it was exceeded, but point the finger at Plaintiffs to explain why the meeting did not convene on time. As noted above, there is evidence supporting Defendant's allegation.

▉ The Court's inquiry need not reach the parties' attempts to cast blame, however. The First Circuit's ruling in *Roland M.* allows the court merely to address whether the delay harmed the Plaintiffs. *See Roland M.*, 910 F.2d at 994. The hearing officer found that the preponderance of the evidence in this case failed to demonstrate any harm flowing to the Plaintiffs as a result of the late PET. The Court agrees. Despite the delay, both parents attended the manifestation review meeting, and had an opportunity to participate in it (although they chose not to). There is no evidence that holding the meeting two days late affected its outcome, or the method by which the PET ad-

dressed the issues. Finally, it does not appear that Jacob suffered any ill effects from the tardiness of the meeting, considering that his parents and teacher arranged for him to receive remedial reading instruction to make up for lost time.

In short, Plaintiffs have not presented any evidence to give the Court reason to believe that conducting the review two days late impeded their ability to participate in the process, or negatively affected Jacob in any way. Applying the rule in *Roland M.*, the Court finds that the delay in holding the manifestation review was harmless and does not warrant the annulment of Jacob's expulsion.

### 3. The PET's Failure to Consider the Results of the Burks Test

▉ A PET must consider all information relevant to making a decision when it conducts a manifestation review. *See* 20 U.S.C. § 1415(k)(4)(C). In this case, Defendant did not include the results of the 1998 Burks Behavior Scale test in the materials the PET considered in conducting the manifestation review. Plaintiffs contend that the evidence of a behavioral problem contained in the Burks results was relevant to the PET's determination, and that without it the manifestation review was invalid. The hearing officer did not address this point, although Plaintiffs raised it in their due process hearing briefs.

The Burks results were certainly relevant. Therefore, the Court must examine the impact the failure to provide the Burks results had on the student's and parents' rights. *See Roland M.*, 910 F.2d at 994. If the information would have caused the PET to find that Jacob's behavior was indeed a manifestation of his disability, then the expulsion clearly caused an unwarranted loss of educational benefits and interfered with Jacob's access to FAPE.

The preponderance of the evidence suggests the opposite would have occurred, however. There is no indication in the record that the PET decision-makers would have given *any* weight to the Burks test results. Therefore the exclusion of the results from the manifestation review was harmless, and Plaintiffs' argument fails.

## B. The Substance of the Manifestation Determination Review

In addition to their objections to the procedural irregularities surrounding the manifestation review, Plaintiffs also challenge both of the substantive decisions made during the review. The Court addresses each objection below.

### 1. The Adequacy of the Manifestation Review

█ Plaintiffs contend that the hearing officer erred in finding that the PET's manifestation decision was correct. They argue that the PET should have found that Jacob's behavior was a manifestation of his disability because his disability included a tendency to act impulsively. Although weighing a previously undiagnosed disability in a manifestation review is permitted under the IDEA, the hearing officer found no credible evidence to support Plaintiffs' claims.

There is no need for the Court to determine whether Jacob's alleged new disability actually existed, because Plaintiffs have failed to demonstrate by a preponderance of the evidence that an "impulsivity" problem such as the one they describe would manifest itself in a decision to sell marijuana. Plaintiffs apparently assume that drug selling and "impulsivity" are related. However, they have failed to support their assumption with any concrete evidence beyond suggesting that the decision to sell drugs is such a poor one that only a behavioral disability could prompt Jacob to make it. *Cf. Richland Sch. Dist,* 2000 U.S. Dist. LEXIS 15162 at *13–16, 42–46 (affirming hearing officer's finding upon extensive expert witness testimony that child had a previously undiagnosed disability).

Defendant, on the other hand, has presented strong evidence that the tendency to make impulsive decisions and the resolve to peddle narcotics at school are not at all synonymous. In particular, Defendant showed that Jacob understood school rules and that his actions involving the marijuana took place over several hours, involving not a single decision, but many individual ones. These facts are completely antithetical to Plaintiffs' impulsivity theory. *See, e.g., Doe,* 115 F.3d at 1281–82 (finding that evidence that child understood school rules and made calculated decision to bring marijuana to school defeated argument that child acted impulsively). Therefore, the preponderance of the evidence supports the conclusion that *even if* the school had treated Jacob as having a behavioral disorder characterized by impulsive decision-making, the PET would not have decided differently. Therefore, the hearing officer's finding affirming the manifestation review was correct.[3]

**3.** The Court notes its reservation about the Plaintiffs' right to argue to the hearing officer that Jacob's disability included a tendency to act impulsively, given their failure to do so at the manifestation review. The IDEA's procedures encourage a cooperative process in which parents raise concerns about their children's educational difficulties to the PET. The Court fears that allowing parents to remain silent at a manifestation review, but permitting them to raise objections to its outcome on appeal, defeats the purpose of the scheme. It is not clear to what extent the doctrine of waiver applies to this context. *See generally Northern Wind, Inc. v. Daley,* 200 F.3d 13, 18 (1st Cir.1999).

### 2. The Adequacy of the "Expulsion IEP"

■ The Plaintiffs also disagree with the hearing officer's finding that the so-called "expulsion IEP" that the PET developed to outline Jacob's out-of-school educational program was adequate to provide Jacob with FAPE. They argue that the lack of art, computer and physical education instruction rendered the IEP insufficient to meet the requirements of the school's "general curriculum." Defendant counters that art, computers and physical education were not part of the general curriculum, because they were not courses that Jacob was required to pass in order to advance to ninth grade. Defendant also points out that the regulations implementing the IDEA merely require that the student be able to "appropriately progress" in the general curriculum, rather than "participate" in it. *See id.* The hearing officer agreed with the Defendant, basing his decision upon the regulatory language.

The issue is whether art, computers and physical education comprise a portion of Jacob's in-school general curriculum for the period he will spend out of school.[4] The Maine education regulations require instruction in all three of the subjects during high school, but for limited periods of time each.[5] Only one "credit" of art and physical education is mandatory.[6] *See* 127 Me. Ed. Reg. 127.12. There is no credit requirement for computer education. *See id.* Students must merely demonstrate "computer skills," and the regulations

leave individual schools to develop their own standards for proficiency. *See id.* In other words, the exclusion of the three subjects from Jacob's expulsion IEP does not foreclose his ability to obtain the credits or skills needed to graduate later. Thus, the expulsion IEP allows Jacob to "progress" in the general curriculum, and Plaintiffs' argument is without merit.

### C. Other Procedural Defects

#### 1. Defendant's Alleged Failure to Provide Plaintiffs with Adequate Notice of Jacob's Impending Change of Placement

■ Plaintiffs argue that the school's alleged failure to give proper notice to the parents before the School Board voted to change Jacob's placement is fatal to the expulsion decision. However, Plaintiffs have not presented any evidence that they were at all hindered in participating in the School Board meeting, or in any other part of the disciplinary or appeals process. Applying *Roland M.*, the preponderance of the evidence supports the conclusion that any failure of notice that occurred in this case was harmless.

#### 2. The Failure to Conduct a Functional Behavioral Assessment

■ No functional behavioral assessment has been held to address Jacob's misbehavior, as required under the IDEA. *See* 20 U.S.C. § 1415(a)(2). Plaintiffs contend that a timely functional behavioral assessment would have revealed evidence

---

4. We must address whether the expulsion IEP would be appropriate to replace Jacob's ninth-grade general curriculum, since that is the grade from which he would be expelled if Defendant enforces his punishment.

5. Local school agencies may define more specific curricula. However, no evidence of the curriculum in M.S.A.D. 59 has been submitted in this case, so the Court must rely on the

regulations developed by the Maine Department of Education pursuant to 20–A M.S.A. § 7404.

6. Sixteen credits are required to graduate from high school. *See* 127 Me. Ed. Reg. § 127.11. A credit equals one year's worth of course work. *See id.* at § 127.02.

that Jacob suffered from a previously undiagnosed disability. Defendant counters that the assessment would have been held but for Plaintiffs' refusal to cooperate with an outside consultant whom the Defendant proposed to hire. Although Plaintiffs raised this issue in the due process hearing, the hearing officer did not address it in his decision.

Once again, the Court need not concern itself with the parties' finger pointing. The fact is, although Plaintiffs are sure that the functional behavioral assessment would have produced valuable information for the PET to use in its manifestation review, they present no evidence to support that assertion. Instead, the weight of the evidence tips the scales in favor of the Defendant, whose witnesses (two special education teachers with experience working with children with disabilities) rejected the suggestion that Jacob's disability, even if it includes a tendency to act impulsively, contributed to his decision to sell marijuana. In other words, the preponderance of the evidence fails to show that the procedural error of failing to conduct an assessment had a negative impact upon the rights of the Plaintiffs. Therefore, insofar as the PET lacked the information that would have been derived from the assessment, the failure to hold the assessment was harmless.

█ Furthermore, the Court finds the Plaintiffs' explanation for why they have not cooperated with the consultant whom the PET asked to help with the assessment unavailing. Although it is indeed the PET's duty to conduct a functional behavior assessment, hiring outside help to compile the information necessary for the assessment is reasonable and appropriate. To serve the best interest of Jacob, the assessment should be conducted as soon as practicable.

### 3. The Hearing Officer's "Stay Put" Ruling

█ Finally, Plaintiffs argue that the hearing officer should have allowed Jacob to stay in school for the first forty-five days of his expulsion, pending his parents' appeal. To support their position, Plaintiffs point out that Defendant never explicitly suspended Jacob under the IDEA's forty-five day suspension rule for drug offenders. Instead, the school board simply expelled Jacob and apparently assumed that if the expulsion did not withstand the scrutiny of the PET's manifestation determination, Jacob would serve a forty-five day suspension instead.

Plaintiffs do not claim that the school did not have the right to suspend Jacob for forty-five days. *See* 20 U.S.C. § 1415(k)(1)(A)(ii). Nor do they argue that "stay put" would have applied to Jacob if the School Board had explicitly suspended him under section 1415(k)(1)(A)(ii). *See* 64 Fed.Reg. 12,626 (Mar. 12, 1999). Plaintiffs merely argue that because the school did not clearly specify the legal authority upon which it based its decision to punish Jacob, its ability to keep Jacob out of school was lost.

Notwithstanding this error by the school, Plaintiffs have failed to show any resulting harm. The preponderance of the evidence shows that Jacob's out-of-school IEP was adequate. It also shows that the parents had ample opportunity to participate in the development of Jacob's educational program and placement, and in the disciplinary proceedings. In short, there is no evidence that the school's failure to explicitly state the terms of Jacob's suspension and expulsion had any negative impact whatsoever upon Jacob or his parents. Therefore, the Plaintiffs' final objection is without merit.

## V. CONCLUSIONS OF LAW

Pursuant to the Findings of Fact and Discussion above, the Court adopts the following Conclusions of Law:

1. The hearing officer did not err in finding that a manifestation review need not be held prior to a local educational agency decision to change the placement of a child with a disability pursuant to generally applicable school disciplinary rules. *See* 20 U.S.C. § 1415(k)(1)(A), (k)(4)(A)(ii).

2. The hearing officer did not err in finding that the two-day delay in holding the manifestation review was harmless and did not warrant annulment of the expulsion. *See Roland M.*, 910 F.2d at 994.

3. The PET's failure to consider the Burks test was harmless and does not warrant annulment of the expulsion. *See id.*

4. The hearing officer did not err in affirming the PET's finding that Jacob's misbehavior was not a manifestation of his disability. *See id.*

5. The hearing officer did not err in finding that the "expulsion IEP" was adequate to allow Jacob to appropriately progress in the general curriculum. *See* 127 Me. Ed. Reg. 127.12.

6. Any failure by Defendant to provide notice to Plaintiffs of the School Board's impending decision to expel Jacob was harmless and does not warrant annulment of the expulsion. *See Roland M.*, 910 F.2d at 994.

7. Defendant's failure to conduct a timely functional behavioral assessment of Jacob was harmless to the PET's determination that Jacob's behavior was not a manifestation of his disability, and does not warrant annulment of the expulsion. *See id.*

8. The hearing officer did not err in denying Plaintiffs "stay put" relief prior to the end of the first forty-five days of Jacob's expulsion. *See id.*

## VI. CONCLUSION

Pursuant to the above Findings of Fact and Conclusions of Law, the Court AFFIRMS the hearing officer's findings.

Furthermore, the Court ORDERS the parties to proceed with a functional behavioral assessment of Jacob as soon as practicable. An outside consultant may be employed to aid the PET in doing so.

SO ORDERED.