## In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-3858

ALEX R., a minor, by and through BETH R.,
and BETH R., his mother and next friend,

*Plaintiffs-Appellants,*

*v.*

FORRESTVILLE VALLEY COMMUNITY UNIT
SCHOOL DISTRICT #221,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
Nos. 02 C 50373, 02 C 50502—**Philip G. Reinhard**, *Judge.*

ARGUED APRIL 2, 2004—DECIDED JULY 15, 2004

Before EASTERBROOK, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1401, *et seq.,* ("IDEA"), a state that accepts federal funding to educate disabled children must provide such children with an edu-

cation that is free, public, and appropriate. Alex R.[1], through his mother, appeals from the district court's entry of judgment in favor of the Forrestville Valley, Illinois Community Unit School District # 221 ("the District"), arguing that the District did not provide him with an appropriate education from April through November 2001 and that it committed several other violations of the IDEA. We affirm.

## I.

Alex suffers from a variant of the Landau-Kleffner Syndrome, a rare neurological disorder that begins in childhood and affects parts of the brain that control speech and comprehension. Children afflicted with the disorder may display symptoms that include hyperactivity, poor attention, depression, and irritability.

The District knew that Alex had the syndrome before he entered kindergarten in the late summer of 1998. In May 1998, it accordingly prepared for Alex an individualized education program ("IEP"), which is a written statement that maps out how a school district will provide an IDEA-compliant education. *See* 20 U.S.C. § 1414(d) (2000). The IEP called for Alex to be included in the regular-education classroom at the German Valley Grade School and provided for individualized instruction; the assistance of a classroom aide; an extended kindergarten day for instruction and therapy; and speech and language services for 60 minutes per week. The District likewise prepared IEPs for Alex in April 1999 and April 2000, modestly adjusting the program annually to meet Alex's changing needs before he pro-

---

[1] Alex R.'s mother, Beth, is also a party in her own right, but for ease of use we refer only to Alex R.

gressed to the first and second grades. Although Alex exhibited behavioral problems consistent with his disability, he committed no disciplinary infractions from kindergarten through second grade.

During Alex's year in the second grade (2000-01), his parents divorced, his sister was sexually assaulted, and his disability-related behavior began to impede his learning. Exactly at what point Alex's learning began to be obstructed is unclear. The resource-room teacher who worked with Alex for all of that year testified that Alex's disability-related behavior did not impede his learning until the second half of the year, although even then learning was still possible with sufficient redirection. One of Alex's second-grade teachers, however, testified that Alex's behavior impeded his learning during the first three, and last nine, weeks of the school year. (In between, that teacher was on maternity leave and could not observe Alex.)[2] Despite whatever impediment to learning existed, however, Alex's record shows satisfactory progress for every course in his second grade year.

Confronted with the deteriorating situation, in February 2001 the District directed school psychologist Marlene Schuler to conduct a functional behavioral assessment of Alex. Schuler had almost a decade of experience as a school psychologist and had conducted four such assessments. She also had worked with Alex since before kindergarten. In April 2001, the District prepared a functional behavioral analysis based on Schuler's data. Its conclusion was that Alex had problems with off-task behavior and making noise.

---

[2] Neither the district court nor the hearing officer found that there was a precise moment during the 2000-01 school year at which Alex's disability began to impede his learning, but it seems clear that it did so at some point in that school year.

The District also arranged a number of visits by outside consultants. Project Choices, an independent consulting group funded by the Illinois State Board of Education, observed Alex in school on April 12, September 11, and September 24, 2001. The District and Alex's mother agreed to wait until after Project Choices completed its observations and provided its input before completing a formal behavioral intervention plan to guide Alex to more appropriate behavior. In its reports, Project Choices congratulated the school for having "an excellent team of professionals" working with Alex. Project Choices also commended Alex's third-grade teacher, Denise Cheek, for having "a very welcoming classroom" and noted that Alex's aides did "a beautiful job of supporting Alex." Project Choices made several recommendations, such as breaking tasks into smaller blocks of time, that the District implemented for Alex in the third grade. The District further arranged for an observation by Geri Gelander, a specialist in low-incidence disabilities who had earlier worked with another student diagnosed with the syndrome. Gelander observed Alex on October 3, 2001, and made a number of recommendations that the District implemented.

In the meantime, in May 2001, the District's IEP team[3]

---

[3] "IEP team"means a group of individuals composed of—

    (i)   the parents of a child with a disability;

    (ii)  at least one regular education teacher of such child (if the child is, or may be, participating in the regular education environment);

    (iii) at least one special education teacher, or where appropriate, at least one special education provider of such child;

    (iv) a representative of the local educational agency who—

        (I) is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs

(continued...)

prepared the IEP for Alex's upcoming year in the third grade. The third-grade IEP called for Alex to study math and social studies in the regular-education classroom, and to study reading, language, and spelling in a resource room. He was to receive special speech and language training for one hour per week; a classroom aide; occupational therapy for two hours per semester; and social-work services for one hour per semester.

Alex began the third grade in the late summer of 2001. At that point, he was nine years old and weighed about 150 pounds. He soon began to commit a series of violent attacks on staff members, his fellow students, and property. During a field trip on September 25 (the day after Project Choices made its last visit and rendered its compliments), Alex filled a glove with rocks and hit several other students with it. The IEP team met on September 26 and revised Alex's IEP to include an individual aide and a sensory diet.

On October 3, Alex left the school building, crossed the street to an auto body shop, and swung a piece of sheet metal at staff members who came to retrieve him. Alex

---

[3] (...continued)
> of children with disabilities;
>> (II) is knowledgeable about the general curriculum; and
>> (III) is knowledgeable about the availability of resources of the local educational agency;
> (v) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in clauses (ii) through (vi);
> (vi) at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and
> (vii) whenever appropriate, the child with a disability.

20 U.S.C. § 1414(d)(1)(B).

refused to return, and school personnel then carried him back to school while he dragged his feet. Shortly thereafter, on October 10, the District's IEP team met to draft a behavioral intervention plan, which they completed on October 17. The plan called for various tactics, including, among other things, an adopted curriculum; more visual aids; sensory breaks; and a "water bottle with pop top." Before the plan was implemented, however, Alex became increasingly violent.

On October 11, Alex began pacing in the back of his classroom and speaking loudly. He swung his backpack near students and desktop computers and charged his individual aide, striking her. Alex then began rolling around the room, first near students' desks and then near the legs of a folding table holding computer equipment. School staff removed Alex to another classroom, where he imitated karate-style chops and kicks. He also charged his teacher, ramming her into the classroom door, clawing her, and, as a photo taken by the District reveals, leaving scratch marks on her chest.

Beginning on October 12, Alex served a five-day suspension for this incident. Also after this episode, Alex's mother filed a charge with Illinois Department of Children and Family Services, alleging that Cheek kicked Alex without justification during these events. The ensuing investigation did not find that the teacher engaged in any wrongdoing. Alex's mother also complained to the sheriff's department, but the investigation by law enforcement resulted in no charges being filed against the teacher. In the wake of these events, school superintendent Lowell Taylor wrote a memo to staff members, dated October 16, in which he instructed that "[f]light risk will be responded to by summoning law enforcement. Faculty and staff should not put themselves or others at unreasonable/substantial risk because of Alex's violent tendencies."

On October 19, Alex left school during the day and walked home, while an aide and the principal followed him. On October 22, he once again became disruptive in class. After school staff evacuated the other students, Alex pulled papers from the wall and tore them. He rifled through other students' desks, taking pencils and biting them in half. He kicked a bucket of Leggos across the room. The District's photos of the aftermath of this disruption reveal a shambles. Beginning on October 23, Alex served a two-day suspension for this incident.

The IEP team again met on October 24 and revised Alex's IEP to place him in the regular-education classroom at the Leaf River Grade School, in accordance with the request of Alex's mother that he be reunited there with one of his favorite teachers, who had transferred to that school. Alex was to have an individual aide; occupational therapy for two hours a semester; speech and language therapy for one hour per week; and social work services for one hour per semester. On October 26, Alex began at the new school. Around lunchtime on that day, a caseworker from the Department of Children and Family Services arrived to investigate a charge against Alex's mother regarding a problem at home. Alex met the caseworker in a conference room, but then left the room rolling on a chair into his classroom, where he hit another student and rammed the teacher several times.

Although the teacher tried to stop Alex from leaving the room, he once again managed to leave school. Several staff members followed him, and someone at the school called the police. Alex led a procession of his pursuers through the playground, down a sidewalk, and to the edge of a cornfield. There, he turned to his aide, said "so long, suckers," and disappeared into the cornfield. After a three-hour search involving both fixed-wing and rotary aircraft, as well

as searchers on the ground, rescuers found Alex stuck in the muddy banks of the Leaf River. His body temperature was 92.7 degrees Fahrenheit.

After Alex recovered from hypothermia and served a ten-day suspension for his actions on October 26, the District assigned him to a special classroom for students with behavioral disorders at the Mary Morgan Elementary School. At his new school, Alex was part of a program that had fewer than eight students and was staffed by a classroom teacher, a student teacher, two aides, and a social worker who was in the room almost full-time. Despite the increased attention, over the next five months Alex would scratch, kick, swear at, and make comments about murdering, staff members. On one occasion, he attacked and drew blood from two female staff members. He also committed numerous attacks on school property, including one incident in which he urinated on the floor.

On October 29, 2001, Alex's mother initiated administrative proceedings with the Illinois State Board of Education, asserting that the District failed to comply with the IDEA. After a hearing at which both sides presented testimony and other evidence, the hearing officer began her legal analysis by observing that

> [t]he main issue in this case is whether the school district offered the student a free, appropriate public education ("FAPE") as required under the IDEA. . . . To determine whether the school district has provided a FAPE requires the determination of whether the school district: (1) complied with the IDEA's procedural requirements, and (2) developed an IEP that is "reasonable [sic] calculated to enable the child to receive educational benefits." *Board of Education of the Hendrick Hudson Central School District, Westchester County et al. v. Rowley*, 458 U.S. 17[6], 206 (1982) . . . .

After four pages of analysis, the hearing officer concluded that, although the District had complied with the procedural requirements of the IDEA, it had nonetheless violated the statute by "fail[ing] to develop an IEP that [was] reasonably calculated to enable this student to receive educational benefit."

The hearing officer then went on to discuss various other matters, including whether the District adequately trained and supervised its teachers; whether Superintendent Taylor lied under oath; and whether the District created a hostile environment for Alex. The hearing officer never tied any of this discussion into legal authority. The hearing officer also concluded that the District violated its obligation to educate Alex in the least restrictive environment, in contravention of 20 U.S.C. § 1412(a)(5). Ultimately, the hearing officer ordered the District to provide extensive relief, including, among other things, the appointment of private consultants who would essentially manage and deliver Alex's public education. She also required that the District "develop a disability awareness and sensitivity curriculum and begin teaching this curriculum to every class within the district from kindergarten to twelfth grade by the second semester of the 2002-2003 school year." In addition, she required that the District return Alex to a regular-education classroom.

The District then filed an action in the district court, seeking reversal of the hearing officer's order. On the parties' cross-motions for summary judgment, the district court framed the primary issue as "whether the District was unreasonable in the IEP it developed and in carrying it out during the September 2000 through November 2001 period."[4] After reviewing both the administrative record and

---

[4] The district court may have been too broad in its definition of
(continued...)

new evidence that both parties had submitted, the district court concluded that the hearing officer's determination was contrary to the preponderance of the evidence and reversed the administrative order. In its order, the district court discussed Alex's escalating pattern of violence and disruption, as well as mentioning the District's continual revisions to Alex's IEP that were designed to manage that behavior. It then reasoned as follows:

> The question before the court is whether the District was unreasonable in its development and implementation of Alex's IEP. A thorough review of the record reveals the District was not unreasonable. The District developed an IEP for Alex and continually updated and evaluated it. The faculty and staff worked to implement this plan and worked co-operatively with Alex's mother to provide modifications as needed. They were particularly responsive to his mother's requests concerning whether to undertake a formal behavior implementation plan ("BIP"). They initially honored her request to proceed informally when Alex was in kindergarten and in the spring of 2001 agreed with her to gather data and to proceed with a BIP in the fall. The events of the fall of 2001 described above unfolded rapidly and the District IEP team met frequently to try to adjust to the rapidly deteriorating situation. Prior to September 2001, the

---

[4] (...continued)
the relevant time period. According to Alex's Local Rule 56.1 statement, "[a]t all relevant times, Alex R. was a 9 year-old" student. Given that Alex turned nine on April 10, 2001, the relevant window of time did not begin until that date. Because the disputed IEPs were all in effect between April and November 2001, and since the most serious behavioral problems occurred after Alex turned nine, any error in the calculation of the relevant time period was harmless.

District cannot be said to have acted unreasonably in its education of Alex. From September through November of 2001, the District acted reasonably in attempting to deal with an increasingly difficult situation affecting not only Alex but the other students as well. The District acted in a manner that was reasonably calculated to enable the child to receive educational benefits. The unfortunate events of October 2001, while traumatic to all involved, did not deny Alex a FAPE. The District acted to deal with these events through the IEP process.

Alex presented expert testimony to the effect that the District did not do what it should have to appropriately educate Alex. It may be true the district could have done a better job or had a better grasp of the needs Alex had or been better trained to deal with his problems. However, the District did not act unreasonably given the circumstances it faced. The District took a thoughtful, measured approach to Alex's education. The hearing officer substituted her judgment for that of the school administrators. The hearing officer thought the administrators were mistaken and they may have been. However, the administrators were not unreasonable.

*Forrestville Bd. of Educ. v. Illinois State Bd. of Educ.*, No. 02 C 50373, 2003 WL 22287388, at *3 (N.D. Ill. Sept. 30, 2003). Alex appeals.


II.

Under the IDEA, Congress has conditioned federal funding for the education of disabled children on a state's adherence to certain conditions. *Beth B. v. Van Clay*, 282 F.3d 493, 497 (7th Cir. 2002). Illinois chose to accept the federal funds, and the District does not challenge the constitutionality of the conditions Congress imposed in exchange for

those funds. *See South Dakota v. Dole,* 483 U.S. 203, 211 (1987) ("Our cases have recognized that in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion.") (quotation omitted). Thus, it is uncontroverted that the District had to comply with the IDEA.

The IDEA entitles a disabled child to an education that is (1) free; (2) appropriate; and (3) public. 20 U.S.C. § 1412(a)(1).[5] A parent who believes that his child's rights under the IDEA were violated may pursue relief in state administrative proceedings. *See* 20 U.S.C. § 1415(f). Alex's mother, as mentioned above, did just that, and the hearing officer ordered various forms of relief.

"Any party aggrieved by the findings and decision" of the administrative proceedings may file a civil action in the federal district court or in any state court of competent jurisdiction. 20 U.S.C. § 1415(i)(2)(A). Having lost in the administrative proceedings, the District sought relief in the district court, which concluded that the District had provided Alex with an IDEA-compliant education during the period in question and overturned all of the relief ordered by the hearing officer. Although the district court reached its holding by ruling on cross-motions for summary judgment, the term "summary judgment" in the context of an IDEA case has a different meaning than it has in a typical Rule 56 motion. The motions filed by each party might more accurately have been titled "motion for judgment under the

---

[5] Courts frequently use the acronym FAPE (for "free, appropriate, public education") as shorthand for these requirements. Here, however, the acronym would not be helpful. Indisputably, Alex's education was both free and public; the debate concerns whether it was appropriate.

IDEA." Labels aside, the party challenging the outcome of the administrative proceedings, here the District, bears the burden of proof. *Heather S. by Kathy S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997). In deciding whether the challenging party meets that burden, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415 (i)(2)(B).

On issues of law, the hearing officer is entitled to no deference. *Dale M. ex rel. Alice M. v. Board of Educ.*, 237 F.3d 813, 817 (7th Cir. 2001). On issues of fact, however, the district court must accord "due weight" to the decision of the hearing officer. *Board of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). The rationale for this requirement is that, by mandating that district courts "receive the records of the [state] administrative proceedings," the statute implies that district courts must afford an appropriate level of deference—what the Supreme Court has styled as "due weight"—to those proceedings. *Id.*

"Due weight" varies from case to case. At one end of the continuum, where the district court does not take new evidence and relies solely on the administrative record, it owes considerable deference to the hearing officer, and may set aside the administrative order only if it is "strongly convinced that the order is erroneous." *School Dist. v. Z.S.*, 295 F.3d 671, 675 (7th Cir. 2002) (quotation omitted). This level of review is akin to the standards of clear error or substantial evidence. *Id.*

The more that the district court relies on new evidence, however, the less it should defer to the administrative decision: "[j]udicial review is more searching the greater the amount (weighted by significance) of the evidence that the

court has but the agency did not have." *Id.* Thus, at the opposite extreme from cases in which the district court hears no new evidence, the administrative decision is relatively less important and the district court effectively acts as the factfinder. *See MM ex rel. DM v. School Dist.*, 303 F.3d 523, 531 & n.12 (4th Cir. 2002). In such circumstances, although the administrative record is still part of the case and the district court therefore must not go so far as to conduct a trial de novo, *see Monticello Sch. Dist. No. 25 v. George L.*, 102 F.3d 895, 901 (7th Cir. 1996), less weight is due the administrative record.

On appeal, our review of questions of law is plenary and our review of the district court's findings of fact is for clear error. *Beth B.*, 282 F.3d at 496.

### A.   *Issues of Law*

The first issue we address is whether the district court erred when it considered the disruptive impact that Alex had on other students as a relevant consideration in deciding whether he received an appropriate education. Alex argues that whether an education was appropriate depends not on "what the child did or did not do wrong, but rather [it depends] on whether the school district appropriately addressed the child's needs and provided him with a meaningful education[al] benefit under the substantive prong of *Rowley.*" That premise, as we discuss below, is basically true in cases where the validity of the IEP is in question; however, it does not lead to the conclusion that the district court should not have considered Alex's disruptive impact on the classroom. In fact, it leads to the opposite conclusion. To understand why, we must take a step backward and look at the larger framework governing this case.

The primary question before the district court was whether Alex's education was appropriate. In its "definitions" section, the IDEA does not separately define "appropriate." *See* 20 U.S.C. § 1401. The statute does, however, define the term "free appropriate public education" as meaning "education and related services that":

> (A) have been provided at public expense, under public supervision and direction, and without charge;

> (B) meet the standards of the State educational agency;

> (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and

> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(8). Subsection A concerns the "free" and "public" requirements, and the remaining three subsections concern the criteria relating to whether an education is "appropriate." Alex's main argument before the district court was that his education was inappropriate because, between April and November 2001, it failed to meet the criterion of appropriateness provided by subsection D; in other words, Alex argued that his education was not provided pursuant to a valid IEP.

*Rowley* instructs that an IEP is valid when (1) it was adopted according to the IDEA's procedures and (2) it is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07. To meet the second, substantive criterion of *Rowley*, an IEP must respond to all significant facets of the student's disability, both academic and behavioral. *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 642 (8th Cir. 2003). That is why a school district's IEP team is required to assess whether the student's

disability-related "behavior impedes his or her learning *or that of others*" in the classroom. 20 U.S.C. § 1414(d)(3) (B)(i) (emphasis added). An IEP that fails to address disability-related actions of violence and disruption in the classroom is not "reasonably calculated to enable the child to receive educational benefits." Nor does it address an important aspect of the student's disability. It also does not reflect the IEP's team's consideration of whether the student's "behavior impedes his or her learning or that of others" in the classroom. Accordingly, it was correct for the district court to consider the history of Alex's disability, including his disruptive outbursts in the classroom, when evaluating the substantive adequacy of Alex's IEP.

We next consider whether the district court applied the correct legal standard in determining whether Alex received an adequate IEP. It did. As the district court pointed out, an IEP is valid when (1) the school district followed the IDEA's procedures and (2) the IEP is "reasonably calculated to enable the child to receive educational benefits." That was a correct statement of the law. *See, e.g., Evanston Comm. Consolidated Sch. Dist. v. Michael M.*, 356 F.3d 798, 802 (7th Cir. 2004). The administrative hearing officer found that the District complied with the correct procedures for drafting Alex's IEP, and Alex did not controvert that finding. Therefore, the primary issue before the district court was prong two: whether, between April and November 2001, Alex's IEP was "reasonably calculated to enable the child to receive educational benefits." That was the question on which the district court correctly focused.

We turn next to Alex's contention that the district court erred as a matter of law by not providing "due weight" to the hearing officer's decision. As noted above, the more that the district court relies on new evidence, the less it should defer to the administrative decision. Here, both parties

adduced new evidence in the district court. Alex submitted extensive affidavits from his mother, behavioral consultant James Emmett, and mental-health counselor Janie Redders. He also submitted a local newspaper article titled "Parents concerned over return of student." The District also submitted additional evidence, including several IEPs and their supporting documents, as well as the affidavit of the associate building administrator for the German Valley Grade School, Christopher Shockey. Some of this new evidence, including the affidavit of Alex's mother, was very important to the determination of whether Alex received an appropriate education. The new evidence was also, in terms of amount, a significant part of the total record before the district court. Furthermore, the district court specifically noted that it reviewed both the administrative record and the evidence put forth for the first time before the district court. We therefore conclude (1) that this case is close to the end of the spectrum at which the hearing officer was entitled to much less deference and (2) that the district court did not err by giving the hearing officer's findings and decision insufficient weight.

We also observe that the hearing officer imposed some extreme measures that obviously went beyond remedying Alex's situation. For example, the imposition of a "disability awareness and sensitivity curriculum" that had to be taught to *every* student in *every* school in the District, regardless of how unconnected those students and schools may have been to Alex's situation, could not possibly have helped to remedy any denial of Alex's rights under the IDEA. The imposition of such unnecessary requirements further supports the district court's conclusion that the hearing officer intended to substitute her "judgment for that of school administrators" instead of simply implementing the IDEA, which also weighs against deference to the administrative decision.

The final issue of law that we address is Alex's contention that the District violated the IDEA because the behavioral intervention plan of October 17 was inadequate. There are two situations, both of which are implicated in this case, in which a behavioral intervention plan could be warranted.

The first occurs when the disabled student is subjected to certain types of discipline. The term "behavioral intervention plan" appears only in one part of the IDEA, 20 U.S.C. § 1415(k)(1), a provision that deals with the discipline of a disabled child. Under § 1415(k)(1), a duty arises to conduct a "functional behavioral assessment," and then implement a "behavioral intervention plan," when the school imposes certain disciplinary sanctions on a disabled child. 20 U.S.C. § 1415(k)(1); *see Farrin v. Maine Sch. Admin. Dist. No. 59*, 165 F. Supp. 2d 37, 42 (D. Me. 2001). On October 11 or 12, the District imposed on Alex a five-day suspension and thus triggered that duty. *See* 20 U.S.C. § 1415(k)(1). At that point, the District was obliged, within ten days, to have conducted a "functional behavioral assessment," 20 U.S.C. § 1415(k)(1)(B)(i), and then, "as soon as practicable," the District had to implement a "behavioral intervention plan." 34 C.F.R. § 300.520(b)(2). It is not disputed that the District adhered to this procedure when it implemented such a plan within a few days of suspending Alex.

A second situation in which a behavioral intervention plan could be warranted occurs when the disabled student exhibits behavior that impedes the learning of himself or others. Although it does not use the term "behavioral intervention plan," 20 U.S.C. § 1414(d)(3)(B)(i) requires a school district's IEP team, "in the case of a child whose behavior impedes his or her learning or that of others, [to] *consider*, when appropriate, strategies, including positive behavioral interventions, strategies, and supports to address that behavior." *Id.* (emphasis added). Alex's behavior began to

impede his learning during second grade, and at that point § 1414(d)(3)(B)(i) obliged the District's IEP team at least to consider whether to implement a behavioral intervention plan, a consideration that the IEP team indisputably made.

The District therefore appears to have complied with the procedural requirements concerning a behavioral intervention plan. Alex's argument, however, is not procedural; it is substantive. Citing *Mason City Community Sch. Dist.*, 36 IDELR 193 (Dec. 13, 2001), Alex maintains that the behavioral intervention plan was substantively "insufficient."

We disagree. As the administrative law judge in *Mason City* stated, "[t]he specific components of the [behavioral intervention plan] are not identified either in the federal statute or the regulations." *Id.* at 199. In other words, as of December 13, 2001, neither Congress nor the agency charged with devising the implementing regulations for the IDEA, the Department of Education, had created any specific substantive requirements for the behavioral intervention plan contemplated by § 1415(k)(1) or § 1414(d)(3)(B)(i). Alex does not point us to any statute or regulation that has since filled the gap, and our research has uncovered none. Alex, nevertheless, urges us to follow the lead of the administrative judge in *Mason City*, who manufactured the substantive criteria of a sufficient behavioral intervention plan based on a string of administrative opinions.

We decline the invitation. Although we may interpret a statute and its implementing regulations, we may not create out of whole cloth substantive provisions for the behavioral intervention plan contemplated by § 1415(k)(1) or § 1414(d)(3)(B)(i). In short, the District's behavioral intervention plan could not have fallen short of substantive criteria that do not exist, and so we conclude as a matter of law that it was not substantively invalid under the IDEA.

*B. Issues of Fact*

Having addressed the issues of law, we turn to the issues of fact. First is whether the district court clearly erred in finding that Alex's IEP was sufficient. Under the IDEA, local educators enjoy latitude in developing the IEP most appropriate for a disabled student and may apply their professional judgment. *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997). An IEP passes muster provided that it is "reasonably calculated to enable the child to receive educational benefits" or, in other words, when it is "likely to produce progress, not regression or trivial educational advancement." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir. 1997) (quoting *Board of Educ. v. Diamond*, 808 F.2d 987 (3d Cir. 1991)); *accord Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998). The requisite degree of reasonable, likely progress varies, depending on the student's abilities. Under *Rowley*, "while one might demand only minimal results in the case of the most severely handicapped children, such results would be insufficient in the case of other children." *Hall by Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir. 1985). Objective factors, such as regular advancement from grade to grade, and achievement of passing grades, usually show satisfactory progress. *Walczak*, 142 F.3d at 130 (citing *Rowley*, 458 U.S. at 207 n.28)). Whether an IEP was "reasonably calculated to enable the child to receive educational benefits" is a question of fact that we review for clear error. *See MM*, 303 F.3d at 531 & n.12 (citing *Tucker v. Calloway County Bd. of Educ.*, 136 F.3d 495, 503 (6th Cir. 1998)).

As discussed above, the IEPs that the District provided to Alex between April and November 2001 differed in degree, not kind, from the IEPs that governed Alex's education in kindergarten, first grade, and second grade. Those earlier

IEPs correlated with Alex's advancement from grade to grade; his avoidance of any disciplinary infractions; and, until some point during the 2000-01 year in second grade, unimpeded learning. It is also significant that Alex's report card shows satisfactory progress in all courses during the second-grade year. There were thus plenty of objective factors showing that the earlier IEPs were likely to produce progress.

When Alex's disability suddenly led to rapidly increasing symptoms between late September and late October 2001, the District responded several times by amending Alex's third-grade IEPs to provide for more of the same types of therapy and supervision that had apparently worked from kindergarten through some point during second grade. Eventually, the IEP team went even further and provided Alex with his own personal aide—an adult whose only function was to attend to Alex. Throughout the IEP process, the District responded in a way that, based on its experience with Alex, appeared reasonably likely to produce progress. As the district court aptly put it, "the District acted reasonably in attempting to deal with an increasingly difficult situation affecting not only Alex but other students as well." Although the District's efforts ultimately did not lead to a favorable outcome, we see no clear error in the district court's finding that Alex's IEPs were "reasonably calculated to enable the child to receive educational benefits."

Alex, of course, disagrees. He points to extensive evidence in the record, particularly from his expert witnesses. Alex's position is that this evidence shows that the handwriting was on the wall before he entered third grade. Accordingly, argues Alex, the District should have foreseen the sudden deterioration that he would undergo in late September and October 2001 and have made radical, preemptive changes in his IEP. As noted above, however, Alex committed no

disciplinary infractions from kindergarten through second grade. His behavior did not begin to impede his learning until some time during his second-grade year. Moreover, he graduated on time from second to third grade and his record shows satisfactory progress for every course during his second grade year. All that Alex's evidence tends to establish is that, had the District possessed better foresight, it might have provided Alex with more effective IEPs before the sudden deterioration in his situation. The dispositive question, however, is not whether the District provided Alex with the best conceivable IEPs; the question is whether the IEPs that it actually provided for him were "reasonably calculated to enable the child to receive educational benefits." The district court did not commit clear error in finding that they were so calculated.

We next turn to Alex's contention that the District failed to train its staff appropriately. In Alex's view, the District should have trained its teachers in "nonviolent crisis intervention" and how to better address the "behavioral and sensory needs" of Alex. The only legal authority on which Alex relies for this argument is *Campbell v. Talledge County Bd. of Educ.*, 518 F. Supp. 47 (N.D. Ala. 1981). In *Campbell*, the district court found that the student's IEP was inadequate and then ordered that the student's teacher be trained to implement the new IEP that the court ordered the school district to provide. *Id.* at 55-56. *Campbell* therefore supports the proposition that, where an IEP is inadequate, increased training may be part of a comprehensive remedy. Here, because we affirm the district court's finding that Alex's IEPs were valid, *Campbell* is inapposite.

Construed more liberally, Alex's argument may be that, even if his IEPs were designed correctly, the District failed to implement those IEPs adequately, because it relied on improperly trained teachers. Regarding implementation of an IEP, the relevant regulation provides as follows:

> (a) Provision of services. Subject to paragraph (b) of this section, each public agency must—(1) Provide special education and related services to a child with a disability in accordance with the child's IEP; and (2) Make a good faith effort to assist the child to achieve the goals and objectives or benchmarks listed in the IEP.

34 C.F.R. § 300.350(a); *see also CJN*, 323 F.3d at 639 (citing § 300.350(a)(2)). It is undisputed that the District met the first requirement. Alex's education was provided as per his IEPs.

As to the second requirement, although "good faith" is an abstract quality, at least where the school district possesses the means to provide the necessary training, it could breach the obligation of good faith by creating a theoretically valid IEP, but then deliberately sabotaging the student's chance to reach the IEP's goals by depriving its staff members of necessary training. In this case, however, we see no clear error in the district court's finding that "the District took a thoughtful, measured approach to Alex's education" and thus did not act in bad faith. The salient fact is that the IEPs that the District prepared, and that Alex's teachers and other staff members executed between April and November 2001, were variations on earlier IEPs that had correlated with significant progress. Those earlier IEPs were carried out by staff with about the same level of training, or lack thereof, that Alex's teachers and other staff had between April and November 2001. The District therefore cannot be said to have acted in bad faith when it relied on such staff members to carry out those IEPs, or at least it was not clear error for the district court to so conclude.

Next, we turn to Alex's argument that the District breached his right to confidentiality under the IDEA. In the section of his opening brief discussing this contention, Alex provides only the conclusory assertion that "Mr. Taylor made sure

people in the community, as well as the police, were privy to details of this child's file." Alex fails to provide, in his argument section, the reasons for his contention that Taylor breached the child's right to confidentiality under the IDEA. Exactly what "details" about Alex that Taylor divulged in violation of the IDEA are left to our imagination. Thus has Alex violated Federal Rule of Appellate Procedure 28(a)(9)(A), which requires that an appellant's argument contain both "contentions *and the reasons for them*." *Id.* (emphasis added); *see also Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004) (applying Rule 28(a)(9)(A) where the appellant failed to cite to facts supporting his argument). We therefore decline to address the merits of this argument. *See id.*

We also do not address the merits of Alex's argument that the District created a hostile environment for him in violation of the IDEA. Alex's only legal authority for that proposition is, as he puts it, "a policy guidance document [issued by the Department of Education in 2000] which detailed the serious and pervasive problem of students in public schools being harassed and discriminated against based upon his or her disability [sic]." Alex does not actually cite to that authority, instead providing a citation to the record that we cannot decipher. This will not do. *See* Fed. R. App. P. 28(a)(9)(A); *Hrobowski*, 358 F.3d at 478.

Finally, we observe that whether the District violated the IDEA by failing to educate Alex in the least restrictive environment is not at issue in this appeal. The IDEA contemplates that an appropriate education is one that occurs in the least restrictive environment. *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 265 (3d Cir. 2003). This principle of "mainstreaming" means that disabled students must, to the maximum extent appropriate, be educated with students who are not disabled. 20 U.S.C. § 1412(a)(5); *Beth B.*, 282 F.3d at 497. The hearing officer apparently thought that

whether Alex was educated in the least restrictive environment was in dispute: she ruled that the District violated § 1412(a)(5) when it placed Alex in the Mary Morgan Elementary School, and she ordered that he be returned to a regular-education classroom. The district court reversed that ruling.

On appeal, however, Alex maintains that an analysis of whether he received an education in the least restrictive environment is inapposite to this case. We are puzzled as to why the hearing officer would have held that the District violated § 1412(a)(5) and ordered it to "reintegrate [Alex] into the regular education classroom" if, as Alex now insists, mainstreaming were not an issue. Regardless of whether mainstreaming ever was disputed in this case, Alex has at least waived appellate review of that question.

## III.

The district court correctly focused on whether the District provided Alex with adequate IEPs and, in deciding that question, properly took into account the different aspects of Alex's disability, including his outbursts in the classroom. Because the district court relied on extensive evidence beyond the administrative record, it was obliged to give the administrative decision significantly less deference. As the district court committed no clear error of fact in concluding that Alex's IEPs were valid and that "the District took a thoughtful, measured approach to Alex's education" (and not an approach marked by bad faith), we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*