In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1319

MARSHALL JOINT SCHOOL DISTRICT NO. 2,

*Plaintiff-Appellant*,

*v.*

C.D., by and through his parents,
BRIAN AND TRACI D.,

*Defendant-Appellee.*

No. 09-2499

TRACI and BRIAN D., as parents of and
on behalf of their minor child C.D.,

*Plaintiffs-Appellees*,

*v.*

MARSHALL JOINT SCHOOL DISTRICT NO. 2,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Western District of Wisconsin.
Nos. 08 CV 00187 & 08 CV 00189—**Barbara B. Crabb**, *Judge.*

ARGUED NOVEMBER 12, 2009—DECIDED AUGUST 2, 2010

Before CUDAHY, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.*  The Appellee C.D. is now a fifth-grade student in the Marshall Joint School District. In kindergarten he was diagnosed with a rare genetic disease, and since then the school district has provided him with additional resources in his academic classes and special education in gym. When he was in second grade the school district reevaluated his eligibility for special education, and a team of educational professionals determined that he no longer met the criteria. His parents disagreed and sought administrative review; the administrative law judge ("ALJ") conducted a lengthy hearing, concluded that the school district had erred, and found that C.D. was still eligible for special education. The school district appealed to the district court, which affirmed, and now it appeals to this court. Because the ALJ applied the wrong legal standard in the eligibility analysis and there is not substantial evidence to support her findings, we reverse.

I.

In 2004, C.D. was diagnosed with Ehlers-Danlos Syndrome ("EDS"), hypermobile type, which is a genetic disease that causes joint hypermobility, commonly called double-jointedness. In C.D.'s case the symptoms are serious: he has poor upper body strength and poor postural and trunk stability, and he suffers from chronic

and intermittent pain.[1] In 2006, he was also diagnosed with attention deficit hyperactivity disorder, inattentive type.

After the EDS diagnosis, C.D. was evaluated and deemed eligible for special education services under the Individuals with Disability Education Act, 20 U.S.C. §§ 1400, *et seq.* ("IDEA" or "Act"). As part of the process, the school district assembled a team of educational professionals to develop an Individualized Education Program ("IEP") for him. Under the IEP, he received adaptive physical education six times a month, physical therapy, occupational therapy, assistive technology, supplemental aids and services, and program modifications in his academic classes. Specifically, his first IEP included providing C.D. with frequent bathroom breaks; positioning aids; extra time to complete academics; motor and self-help tasks; and fine motor adaptations (tape recorder, dictation and limited writing assignments). In the classroom, he used a floor rocker to conserve energy, a special chair at work tables, and a slant board. And when he moved around the school, he could ride in a wagon if walking made him too fatigued. *C.D.*, 592 F. Supp. 2d at 1063.

---

[1] There is an extensive record in this case with many actors, opinions, and reports. The district court compiled a detailed and comprehensive factual history of this case which can be accessed at *Marshall Joint School Dist. No. 2 v. C.D. ex rel. Brian and Traci D.*, 592 F. Supp. 2d 1059 (W.D. Wis. 2009). For the sake of brevity, we recount only those facts that are pertinent to our analysis and holding.

In January 2006, when C.D. was in first grade, a second IEP was created that contained new goals and strictures for his participation in gym class. Among other measures, the IEP called for a periodic consultation between C.D.'s adaptive gym teacher, Stefanie Pingel, and his regular gym teacher before each class and at least fifteen minutes of consultation each month between Pingel and his physical therapist and occupational therapist. *C.D.*, 592 F. Supp. 2d at 1063. A year later, as prescribed by the Act, the team began a periodic reevaluation of C.D.'s eligibility for special education. At the time, C.D. was engaging in regular gym class with certain limits placed on his participation to avoid injury; he also met six times a month with Pingel for adaptive physical education, which is simply another name for special education in gym—we use the terms interchangeably here. The adaptive physical education consisted of providing alternative activities for C.D., so instead of regular push-ups, C.D. would do wall pushups; instead of regular jumping jacks, he would do "snow angels" or do the jumping jacks on a mat. All of this reduced the impact on his joints. In addition, the rules for some of the games the students played were tweaked to allow him to safely participate.[2] These modifications were in place

---

[2] These included keeping C.D. from crawling under other children's legs during "wizard tag," "playing goalie to conserve C.D.'s energy during soccer or hockey, reducing his need to run during 'alien dodge ball' by having the teacher intervene in the game periodically, and letting his partner

(continued...)

when C.D. was in second grade; now he has finished fifth grade, and the school is operating under the same IEP, and providing the same exact services, as mandated by law, until this suit is resolved. 20 U.S.C. § 1415(j).

Under the Act, schools must follow a two-step process to determine whether a student is a "child with a disability" and thereby eligible for special education services. 20 U.S.C. § 1401(3)(A). First, the student must have one of the ailments listed in the statute. Although EDS is not listed, there is a catch-all category titled "other health impairment." *Id.* § 1401(3)(A)(i). For a health condition to qualify as an "other health impairment," it must manifest itself in one of a variety of ways, and it must "[a]dversely affect[] the child's educational performance." 34 C.F.R. § 300.8(c)(9)(ii). Second, if the child's condition does adversely affect his educational performance, then the team must determine whether as a result he "needs special education." 20 U.S.C. § 1401(3)(A)(ii).

During the reevaluation, the team found that C.D. was performing at grade level in his classes. He had met many of his specific IEP goals for gym, and he no longer had many of the original problems that prompted his need for special education in gym. After considering all the evidence, the team concluded that the EDS did not adversely affect his educational performance.

---

[2] (...continued)
run during relay races or the treasure island game and having him sit down if he became fatigued." *C.D.*, 592 F. Supp. 2d at 1065.

Although this finding alone disqualified C.D. as a "child with a disability," the team also addressed the second step in the analysis: whether "by reason thereof, [he] needs special education and related services." *Id.* It found that C.D. did not need special education because his needs could be met in a regular education setting with some slight modifications for his medical and safety needs. These modifications included providing rest breaks and monitoring his progress through the day using an activity log. Concerning his safety needs, the team recommended that a health plan be drafted by his physicians and the school nurse, setting out precise restrictions on his participation in gym class. This health plan would limit his repetitions in certain activities and provide alternative means for completing others.

C.D.'s parents disagreed with the team's conclusions. They maintained that because he cannot safely perform all of the activities in gym class, he is entitled to special education. They sought and obtained administrative review of the team's decision. Following eight days of hearings, the ALJ found that when the team evaluated his eligibility it committed several errors. Ultimately, the ALJ credited the opinion of one of C.D.'s physicians, Dr. Pamela Trapane, that the EDS causes him pain and fatigue and when he experiences that "it can affect his educational performance." *Id.* at 10. Based on that, the ALJ found that C.D.'s "ability to fully and safely perform and participate in certain physical activities at school, including regular PE class and recess, is adversely affected by his EDS." *Id.*

The ALJ also rejected the team's alternative finding that C.D. did not need special education. She dismissed the testimony of Stefanie Pingel, C.D.'s adaptive gym teacher, as unreliable. *Id.* at 12. And she specifically credited the opinion of Dr. Trapane over the team, finding that he "cannot safely engage in unrestricted participation in various activities of the regular PE program and that he requires special education, particularly specially designed PE and related services to meet his unique needs." *Id.* at 11.

The school district sought review by the district court. The district court did not receive any new evidence but instead relied on the record developed before the ALJ. It upheld the ALJ's findings. Specifically, on the issue of whether C.D. needed special education, the district court noted that "[a]lthough the school district makes convincing arguments and another fact finder might have reached a different conclusion, I cannot say that the administrative law judge clearly erred in deciding that C.D. needed special education." *Id.* at 1084.

## II.

Under the Act, the party challenging the outcome of the administrative hearing bears the burden of persuasion in the district court. *Alex R. v. Forrestville Valley County Sch. Dist.*, 375 F.3d 603, 611 (7th Cir. 2004). When that court reviews the administrative decision it gives no deference to the ALJ's legal conclusions. *Id.* ("On issues of law, the hearing officer is entitled to no deference."). But on issues of fact, it must give the ALJ's findings due

weight. *Id.* at 612. When the district court receives no new evidence and relies solely on the administrative record, it owes considerable deference to the ALJ's factual findings. *Id.* In such instances, as it did in this case, the district court is essentially sitting as a reviewing court. *Morton Cmty. Unit Sch. v. J.M.*, 152 F.3d 583, 587 (7th Cir. 1998). And when it sits in this manner, no matter how its rulings are characterized, they "are necessarily rulings of law, which we indeed review de novo, just as we review a grant of summary judgment de novo*." Id.* Thus, we review the ALJ's order directly, giving her findings the same degree of deference as the district court did: due weight on the factual issues and plenary review on legal issues. *Sch. Dist. of WI Dells v. Z.S.*, 295 F.3d 671, 675 (7th Cir. 2002); *Dale M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch.*, 237 F.3d 813, 816-17 (7th Cir. 2001).

III.

This is a complicated case. The record spans thousands of pages with many exhibits, and the district court's sixty-two-page order reflects how involved the hearing was. A large part of the IEP meeting, the hearing, and the ALJ's report centers on C.D. and his performance in his academic classes. In his classes, the ALJ noted he was at "grade level" or "only an average student." And this was after many modifications and accommodations were made for him. ALJ Op. at 8. The discussion of his academic performance, however, obscures the issue at hand: C.D. only received special education in gym, and the ALJ's findings only concerned whether the EDS

adversely affects his educational performance in gym and his need for special education in gym. ALJ Op. at. 10 ("Based on the record as a whole, I find that the Student's ability to fully and safely perform and participate in certain physical activities at school, including regular PE class and recess, is adversely affected by EDS."); *id.* at 12 ("I find that the Student needs special education, particularly specially designed PE, and related services to meet his unique needs."). Therefore, the precise question before us is whether the ALJ erred when she found that C.D.'s educational performance is adversely affected and because of that, he needs special education in gym.

## A.

Special education under the Act is limited to those students classified as a "child with a disability." 20 U.S.C. § 1401(3)(A). For C.D. to qualify, his health condition must adversely affect his educational performance and as a result he must need special education. *Id.* § 1401(3)(A)(ii). Based on a variety of data and factors, the team found that the EDS did not adversely affect C.D.'s educational performance.[3] *C.D.*, 592 F. Supp. 2d

---

[3] The phrase "adversely affects a child's educational performance" is not defined in either the Federal or Wisconsin Regulations. *See Mr. I v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 11 (1st Cir. 2007); Wis. Stat. § 115.76; Wis. Admin. Code §§ PI 11.35, 11.36. And we express no opinion on how that

(continued...)

at 1081. The ALJ disagreed. She found that the EDS adversely affects C.D.'s educational performance. The school district challenges this finding. This presents a mixed question of law and fact; therefore, we review the legal standard applied by the ALJ de novo and her factual findings for clear error. *Alex R.*, 375 F.3d at 611-12.

In her report, the ALJ concluded that the EDS adversely affects C.D.'s educational performance because it causes him to experience pain and fatigue and that when he does "experience[] pain and/or fatigue at school, it can affect his educational performance." ALJ Op. at 10. This is an incorrect formulation of the test. It is not whether something, when considered in the abstract, *can* adversely affect a student's educational performance, but whether in reality it *does*. 34 C.F.R. § 300.8(C)(9)(ii); *see also A.J. v. Bd. of Educ.*, 679 F. Supp. 2d 299, 310 (E.D.N.Y. 2010).

And it is clear from the record that this misstatement of the law affected the ALJ's finding. The misstatement reflected the scant evidence on this point: little of the testimony and few of the exhibits cited by the ALJ stated or even suggested that C.D.'s educational performance was adversely affected by the EDS. Rather, the evidence cited either mirrored the improper recitation of law, was inconsistent with prior findings and testimony, or was entirely discredited during cross-examination.

---

[3] (...continued)

term should be defined. Our review is limited to whether the ALJ applied the correct legal standard in rejecting the team's finding.

Concerning the last point, Dr. Trapane was the main source of evidence cited for the proposition that the EDS adversely affects C.D.'s educational performance. And the sole basis of her information was C.D.'s mother. Dr. Trapane evaluated C.D. for 15 minutes; she did not do any testing or observation of C.D. and his educational performance. In fact, "Dr. Trapane admitted that she has no experience or training in special education and never observed C.D. in the classroom." *C.D.*, 592 F. Supp. 2d at 1073. Her only familiarity with school curricula was with her own children. Such a cursory and conclusory pronouncement does not constitute substantial evidence to support the ALJ's finding.

In short, the ALJ applied the wrong legal standard in determining whether the EDS adversely affected C.D.'s educational performance, and while there is evidence that the EDS can affect C.D.'s educational performance, there is no substantial evidence to support the ALJ's finding that it has an adverse affect. Rather, as the district court noted, the evidence is that the prior IEP's remedies have substantially improved his performance: "all of the school district members of the team, including the school therapists, agreed that C.D.'s average performance and overall improvement showed that his health condition did not have an adverse affect on his educational performance." *C.D.*, 592 F. Supp. 2d at 1080. Thus, we find that the ALJ erred in the legal standard she applied and committed clear error in her factual findings.

IV.

Even if the ALJ had not erred in her finding that the EDS had adversely affected C.D.'s educational performance, that would not have ended the inquiry. As explained above, if an IEP team determines that a child's medical condition adversely affects his educational performance, the team must also determine whether that student requires special education. 20 U.S.C. § 401(3)(A)(ii) (the second step in the analysis is whether the child "needs special education and related services."). In this case, the team concluded that such services were not needed: all of C.D.'s safety needs could be met through a health plan implemented in his regular gym class. The school felt it could address his needs by simply limiting his repetitions and ameliorating the potentially harmful aspects of gym.

In rejecting that decision the ALJ found that the testimony of Stefanie Pingel, C.D.'s adaptive gym teacher, "lacked reliability." ALJ Op. at 12. The ALJ also overrode the team's finding and instead credited the testimony of C.D.'s physician about his need for special education. Relying primarily on the reports of Drs. Nathan Rudin and Trapane and the testimony of Dr. Trapane, the ALJ found that C.D. needed special education because of safety concerns in gym class. It was the team's position throughout these proceedings that physicians cannot simply prescribe special education for a student. Rather, that designation lies within the team's discretion, governed by the applicable rules and regulations. We agree.

A.

The sole reason cited by the ALJ for rejecting the team's position was that Pingel's "testimony lacked reliability." ALJ Op. at 12. We review credibility determinations for clear error. *Alex R.*, 375 F.3d at 612. And we rarely reverse a fact finder on a credibility determination. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). But we will when the reason stated for rejecting the testimony is unreasonable or unsupported; in other words, "[w]e overturn it only if patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotation omitted).

Because the reason for designating special education for C.D. was his need for special training and protection in gym class, Pingel was the key individual in the process. She was among those responsible for formulating C.D.'s prior IEPs, and she was the most important person in implementing them: she was his adaptive gym teacher. As such, she was the one who could testify best concerning whether he needed special education to participate in the gym curriculum and meet the goals for children in his grade level.

Despite Pingel's expertise and unique position in this whole process, the ALJ rejected her testimony as lacking "reliability." The reason given was that although Pingel testified that C.D. did not need special education, her behavior in conducting his activities in gym class contradicted that testimony. ALJ Op. at 4, 12. In support of this, the ALJ specifically noted that Pingel "testified in detail about many adaptations and modifications that she made for the Student to enable him to participate in PE

class," and that Pingel "frequently conferred with the physical therapist and the regular physical education teacher about how to modify activities for [C.D.] to meet his needs." *Id.* at 12.

The problem with rejecting Pingel's testimony on this basis is that the referred-to behavior that supposedly contradicted her testimony was mandated under C.D.'s 2006 IEP. As the district court noted, that IEP prescribed "consultation between the adaptive physical education teacher and the regular physical education teacher before each physical education class; and consultation between the occupational therapist, physical therapist and special area teachers at least 15 minutes a month." *C.D.*, 592 F. Supp. 2d at 1063. Pingel simply followed the directives set out in the IEP, which is precisely what the law demanded of her, even though she may have thought it was unnecessary.

It is unclear what the ALJ would have had Pingel do to assure that her opinion was reliable. Pingel can only do as the law provides: call or wait for another IEP to reevaluate C.D., and then express her belief that he no longer needs to have special education services. 20 U.S.C. § 1414(a)(2)(A)(i). No matter how deeply held her belief that it was unnecessary, Pingel could not unilaterally stop performing any services mandated under the IEP. *Id.* § 1415(j). Discounting an educator's testimony because she complied with the law is unreasonable, and it was clear error for the ALJ to do so. *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006).

B.

Beyond impermissibly rejecting Pingel's testimony, the ALJ also found that C.D. needs special education because of the EDS. We review that finding for clear error and will only set aside the order if we are "strongly convinced that [it] is erroneous." *Z.S.*, 295 F.3d at 675.

Again, it is necessary to re-focus the issue before us. Although C.D.'s performance in classes other than gym was vaguely discussed in the ALJ's report, there are no findings about his need for special education outside of gym. The most inclusive statement in the ALJ's report that could include special education outside of gym comes in the conclusion where she states: "I find that [C.D.] needs special education, particularly specially designed PE, and related services to meet his unique needs." ALJ Op. at 12. That is not a finding that we would give any credence as extending beyond gym class. Without a specific finding and reasoning in support, that statement alone cannot be a basis for finding he is entitled to special education beyond gym class. Thus, the ALJ's decision is pivoted on the need for special education in gym; therefore, our review is limited to whether because of his EDS, C.D. needs special education in gym.

The only support for the finding that he needed special education was the reports of his physicians and the testimony of Dr. Trapane. Her position was clear: C.D. could not safely engage in *unrestricted* participation in various activities of the regular gym program because his joints could be injured, causing him severe pain. *C.D.*, 592 F. Supp. 2d at 1066. The team felt that given the

limitations already prescribed by C.D.'s physicians and the demands of the curriculum, his needs could be addressed by allowing him to participate in regular gym with a health plan. He was, at that time, already engaged in regular gym class; he was only meeting with Pingel in adaptive physical education six times a month. Dr. Rudin was comfortable with the health plan, but Dr. Trapane and C.D.'s mother were adamant that he needed special education.

But C.D. did not need special education in gym. He was, as the district court noted, performing at grade level and had made huge personal gains over previous years: "C.D. had made huge gains, was able to do things he had not been able to do previously and could coordinate his body and perform local motor and object control skills in the average range*." C.D.*, 592 F. Supp. 2d at 1065-66. The initial difficulties that mandated special education had been overcome; what remained were C.D.'s safety needs. And the team thought that the school could meet these needs by giving him a health plan that communicated his limitations between his physicians, the school nurse, and his teachers.

This health plan would allow C.D. to participate in regular gym and avoid the harmful activities or at least reduce the threat of injury during certain exercises. So, he did and would continue to do jumping jacks on a mat and pushups against the wall; he would walk instead of run in a game of tag; and if he was fatigued his repetitions were reduced or he took a break. As Pingel testified concerning her belief that C.D. did not need special education:

> As far as decreasing the number of reps that a child can do, decreasing how much, the amount of time that a child can run, those are all things that a regular P.E. teacher can say to a child, "You're only allowed to do five sit-ups, you're only allowed to walk five laps." It's not something that needs one-on-one direct service.

Allowing C.D. to participate fully in regular gym class with a health plan would not mean that he was sitting in a corner for the class. He was and would be participating with the class. He would simply do so in a manner that protected his joints.

By being provided with this sort of health plan, C.D. can access the general curriculum and make the gains that he needs to make to progress with the other students in the skills and abilities that the school aims to teach in its curriculum. *See Alvin Ind. Sch. Dist. v. A.D.*, 503 F.3d 378, 384 (5th Cir. 2007) (noting student's performance demonstrated that he did not need special education). That is what the law requires and the Act strives for: giving students access to the general curriculum and keeping them from being labeled special education. 20 U.S.C. § 1412(a)(5); *see id.* § 1400(c)(5)(F). The team's decision was reasoned and based on his safety needs and the school's curriculum.

This brings us to a key point in this case: a physician's diagnosis and input on a child's medical condition is important and bears on the team's informed decision on a student's needs. *See* 20 U.S.C. § 1414(c)(1)(A)(iii). But a physician cannot simply prescribe special education;

rather, the Act dictates a full review by an IEP team composed of parents, regular education teachers, special education teachers, and a representative of the local educational agency. *Id.* § 1414(d)(3)(C) (detailing what the IEP must consider); *id.* § 1414(d)(1)(B)(i)-(vii) (detailing the members that must compose a valid IEP team).

Although it appears that the ALJ applied substantial weight to Dr. Trapane's opinion, nothing in the law mandates or even suggests such a requirement. To be clear, the physicians' opinions were given careful attention by the team. They considered Dr. Trapane's comments, and Dr. Rudin, in fact, agreed that a health plan would be appropriate. The only indication that there was a need for special education came from C.D.'s mother and Dr. Trapane—after a 15-minute examination. The cursory examination aside, Dr. Trapane is not a trained educational professional and had no knowledge of the subtle distinctions that affect classifications under the Act and warrant the designation of a child with a disability and special education. *See Schaffer v. Weast*, 546 U.S. 49, 62-63 (2005) ("I believe that we should presume that public school officials are properly performing their difficult responsibilities under this important statute.") (Stevens, J., concurring). Nor was Dr. Trapane familiar with the curriculum and what C.D. needed to do in gym. In sum, her conclusory testimony and reports making an adamant demand for the "special education" classification are not substantial evidence and do not provide a reasoned basis for finding that C.D. needs special education. And it was clear error for the ALJ to find that it was.

As a concluding note and to provide some context to this case and our holding, no one suggests that C.D. would not benefit from or need continued physical and occupational therapy. The record is clear that he would benefit from those services: "All of C.D.'s therapists agreed that even though he did not need special education, he needed physical therapy." *C.D.*, 592 F. Supp. 2d at 1083. But his need for such therapy is not what the school is charged with considering when it evaluates his eligibility for special education. Rather, "physical therapy" and "occupational therapy" are both related services used to give a student the full benefit of special education instruction. 20 U.S.C. §§ 1406, 1401(26) (related services are meant to "assist a child with a disability to benefit from special education."); *see also* Wis. Stat. § 115.76(14)(a). Under the IDEA, they do not stand alone as services the school must provide apart from special education. The law is perfectly clear on this point: if a child has a health problem "but only needs a related service and not special education, the child is not a child with a disability." 34 C.F.R. § 300.8(a)(2)(i); *see also Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369, 1378, n.1 (8th Cir. 1996) (Magill, J., dissenting) (citing 34 C.F.R. § 300.17 n.1 (1995), *amended in* 1999 *by* 64 Fed. Reg. 12425).

V.

Therefore, we find that the ALJ's finding that C.D.'s educational performance was adversely affected by the EDS was undermined by a misapplication of the governing standard and was not supported by substantial

evidence in the record. Further, the ALJ impermissibly discounted the testimony of Stefanie Pingel, and there is not substantial evidence in the record to support the finding that C.D. needed special education because of his health condition. Accordingly, we REVERSE the judgment of the district court and REMAND with instructions to enter judgment in favor of the school district. The fee award below is also VACATED.

CUDAHY, *Circuit Judge*, concurring in the judgment. This is an extraordinarily close case. We have before us a careful and searching opinion by an experienced ALJ based on an extensive hearing and affirmed by a district judge of broad experience and proven judgment. These circumstances may generate a spirit of deference, whether technically required or not.

I write separately only because, although the majority opinion has discovered enough flaws to justify reversal, I suggest future caution in such matters as overruling the conclusions of the finder of fact about the reliability of witnesses. We must also be balanced in the respective weight to be attributed to the opinions of educational professionals in contrast to medical experts in evaluating issues such as that of safety. Both these questions play

a significant part in the majority analysis, but I would emphasize that both ought generally to be treated in the future with appropriate discretion.

In spite of these reservations, since the issue here is so close and the majority critique so careful, I join in the result indicated by the majority.