In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 17-1806

B.G., by his next friend, J.A.G.,

*Plaintiffs-Appellants*,

*v.*

BOARD OF EDUCATION OF THE CITY OF CHICAGO, et al.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-06372 — **Virginia M. Kendall**, *Judge*.

_____

ARGUED MAY 17, 2018 — DECIDED AUGUST 27, 2018

_____

Before BAUER, EASTERBROOK, and MANION, *Circuit Judges*.

MANION, *Circuit Judge*. B.G. and his mother, J.A.G., appeal from the district court's denial of their motion to reverse the ruling of an Illinois State Board of Education Impartial Hearing Officer. J.A.G. had sought public funding for several Individual Educational Evaluations because she believed the Chicago Public Schools' (the District) evaluations of B.G. were inadequate. The hearing officer found that the District proved by a preponderance of the evidence that its evaluations were

appropriate. The district court denied B.G.'s motion[1] to reverse the hearing officer's decision, deferring appropriately to the hearing officer's conclusions. For the reasons stated below, we affirm.

## I. Background

B.G. had an unfortunate childhood. He lived alternately with his mother (who speaks only Spanish) and three siblings in a small apartment, and with his father, who was apparently so much an absentee parent that B.G. was left entirely to his own devices while he was there. He repeated first grade and would have repeated seventh grade had the District not promoted him because of his age. B.G. was diagnosed with a specific learning disability and also had significant behavior and attendance issues—he was absent for one third of the school year during his seventh grade year in 2013-14. All in all, B.G.'s situation at the start of 2014 was already quite bleak.

Things only got worse when B.G.'s father died in April 2014. B.G was hospitalized shortly thereafter with diagnoses of morbid obesity, hypertension, severe hypoxia syndrome, Type 2 diabetes, and obstructive sleep apnea. While B.G. was dealing with his medical issues and the grief from losing his father, the Illinois Department of Children and Family Services received a report that his mother was not able to care for her children. As a result, B.G. was sent to live with his godmother for an unspecified period. He returned to his mother at some point, although the record is unclear about the timing.

In July 2014, B.G.'s mother filed a request for a Due Process Hearing with the Illinois State Board of Education. She

---

[1] B.G. and J.A.G. are referred to collectively as B.G.

alleged that the District had violated the Individuals with Disabilities Education Improvement Act of 2004 and denied B.G. a Free Appropriate Public Education. The parties mediated this claim in August: the District gave B.G. an aide and moved him to a classroom with a teacher familiar with "multisensory approaches to teaching reading and writing for students with dyslexia." *B.G. by J.A.G. v. City of Chicago Sch. Dist. 299*, 243 F. Supp. 2d 964, 970 (N.D. Ill. 2017) (decision below).

Around the same time, the District began to perform the assessments of B.G.'s educational needs that would wind up at the center of this case. The results of these assessments were presented at an October 9, 2014, meeting of B.G.'s Individualized Education Program (IEP) team. Present at the meeting were B.G.'s case manager, all of his District evaluators, his mother, and counsel for both sides. Although she did not voice any objections to the IEP team's report at the meeting, B.G.'s mother soon requested Independent Educational Evaluations (IEEs) at public expense in seven areas: psychology, speech and language, physical therapy, occupational therapy, nursing, social work, and assistive technology. Believing its evaluations were appropriate, the District sought a Due Process Hearing with the State Board of Education to defend its decision not to fund IEEs.

An administrative hearing began in February 2015 before Board-appointed Impartial Hearing Officer Janet K. Maxwell-Wickett. The District presented as witnesses the professionals who evaluated B.G., while B.G. presented two experts who reviewed the record and offered their conclusions that the District's various evaluations were inadequate. The hearing officer found the District's witnesses credible and persuasive, and she discounted the testimony of B.G.'s experts because

they lacked Illinois certifications and had never met B.G. She thus concluded that the District had carried its burden to show that its evaluations were appropriate.

B.G. filed motions in the district court to supplement the administrative record and to reverse the hearing officer's decision. The district court then denied (in relevant part) B.G.'s motion to supplement the administrative record and denied his motion to reverse the hearing officer's decision. *B.G. by J.A.G*, 243 F. Supp. 3d 964 (N.D. Ill. 2017). He timely appealed to this court.

## II. Discussion

### A. Motion to Supplement the Administrative Record

As a preliminary matter, we must review the district court's partial denial of B.G.'s motion to supplement the administrative record. B.G. argues that the district court should have added to the record (1) blank testing protocols for the Comprehensive Assessment of Spoken Language (CASL); and (2) IEEs performed after the administrative hearing by Mari Lane and Ari Goldsmith (the latter of whom was one of B.G.'s experts at the hearing). The court declined largely because it concluded that the proposed additions would change the character of the proceedings from a review of the hearing officer's decision to a trial *de novo*. Additionally, it found that (1) the protocols were not necessary because B.G. had been given several other assessments; and (2) post-hearing IEEs were not relevant to review of the hearing officer's decision.

We review the denial of the motion to supplement for abuse of discretion. *Monticello Sch. Dist. No. 25 v. George L. on Behalf of Brock L.*, 102 F.3d 895, 901–02 (7th Cir. 1996). And the

district court was right to consider whether additional evidence would change the nature of the proceeding; we have cautioned that trial courts should guard against admitting "such evidence to change the character of the hearing from one of review to a trial *de novo*." *Id.* at 901 (quoting *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 791 (1st Cir. 1984)).

We cannot say the district court abused its discretion by concluding that considering the post-hearing IEEs would turn the proceedings into a trial *de novo*. We have explained that "the appropriateness of an IEP 'can only be judged by examining what was objectively reasonable at the time' the case conference committee created the IEP." *M.B. ex rel. Berns v. Hamilton Southeastern Schools*, 668 F.3d 851, 863 (7th Cir. 2011). The same logic applies to IEEs procured not only after the IEP team met, but after the hearing officer heard the case. The district court was in no position to judge how the new IEEs might have contributed to the IEP team's conclusions. Further, admitting the new IEEs into the record would have made the district judge the first arbiter of those evaluations—precisely what we have cautioned district courts to avoid. We decline to disturb the district court's conclusion on this point.

Nor can we say the district court abused its discretion by refusing to add the blank testing protocols to the record. Unlike the IEEs, which B.G. obtained after the due process hearing, the protocol issue was raised at the hearing. The hearing officer sustained the District's objection to the admission of the blank protocols on the ground that they were not the actual protocols that had been used to examine B.G., but she permitted B.G.'s counsel to question the District's speech and language evaluator about whether she had filled out the CASL protocols. In the end, the hearing officer was convinced

that the absence of the protocols used to evaluate B.G. was immaterial because the CASL was only one of several tests the speech and language evaluator administered. As we explain below, the hearing officer's conclusion was reasonable. Thus, the district court's decision to exclude the blank protocols did not amount to an abuse of discretion.

Therefore, we affirm the district court's denial of the motion to supplement the record with the additional IEEs and CASL protocols.

### B. Motion to Reverse the Administrative Decision

With the motion to supplement the record resolved, we move to the heart of the case: whether the district court erred in denying B.G.'s motion to reverse the hearing officer's decision. When a parent disagrees with a public agency's educational evaluation of her child, she has the right to an IEE at public expense in certain situations. 34 C.F.R. § 300.502(b)(1). However, the agency may (as the District did here) seek a due process hearing in order to demonstrate that its evaluation was appropriate. *Id.* § 300.502(b)(2)(i). The appropriateness of the agency's evaluation is generally measured by its compliance with federal regulations, specifically 34 C.F.R. §§ 300.304 and 300.305. If the agency proves by a preponderance of the evidence that its evaluation was appropriate, the parent is not entitled to an IEE at public expense.

In reviewing the hearing officer's decision, the district court was required to "give 'due weight' to the administrative process proceedings." *Monticello*, 102 F.3d at 901. The level of deference due the hearing officer depends upon how much new evidence the district court allows into the record. When

the court hears no new evidence, it owes "considerable defer-
ence" to the hearing officer's factual findings. *Alex R. ex rel.
Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375
F.3d 603, 612 (7th Cir. 2004). It may set the judgment aside
"only if it is 'strongly convinced that the order is erroneous.'"
*Id.* (quoting *School Dist. v. Z.S.*, 295 F.3d 671, 675 (7th Cir.
2002)). This standard is "akin to the standards of clear error
or substantial evidence" under which we review the decisions
of the Social Security Commissioner. See *id.*; cf. *Clifford v. Ap-
fel*, 227 F.3d 863, 869 (7th Cir. 2000) (explaining the standard
of review in Social Security cases).

On appeal, we review the district court's legal conclu-
sion's *de novo* and factual findings for clear error. *Alex R*, 375
F.3d at 612. We emphasize that neither the district court nor
this court should treat IDEA cases "as 'an invitation to the
courts to substitute their own notions of sound educational
policy for those of the school authorities which they review.'"
*Monticello*, 102 F.3d at 901 (quoting *Board of Education v. Row-
ley*, 458 U.S. 176, 206 (1982)).

The vast majority of B.G.'s brief focuses on alleged errors
by the district's psychologists that, in B.G.'s view, render the
district's psychology assessment inappropriate. We will start
there and proceed through B.G.'s complaints about the other
assessments. In the end, however, the significant deference
we owe to both the hearing officer's and the district court's
factual findings dictates the outcome. This case is fact-inten-
sive, and the hearing officer's review of the evidence in her
written decision was comprehensive. Because the hearing of-
ficer resolved the factual issues in the District's favor, our
power to disturb her judgment is significantly constrained.

Substantial evidence in the record supports the hearing of-
ficer's decision that the district's evaluations were appropri-
ate under the governing regulations.

### 1. Psychology Assessment

Two psychologists, Nicole Cintron and Yazmin Coehlo,
conducted the district's psychological assessment of B.G. At
the time of the administrative hearing, Cintron had been a
lead psychologist for the district for eight years. Before that,
she was a first grade teacher for seven years and a special ed-
ucation teacher for three years. She holds a bachelor's and a
master's degree in bilingual special education. Coehlo had
been a school psychologist for three years and holds a mas-
ter's degree in special education, an Illinois Type 73 license,[2]
and bilingual certification in Spanish.

Coehlo administered two assessments before she went on
maternity leave and left Cintron to interpret the data: the
Wechsler Intelligence Scale for Children, Fourth Edition
(WISC-IV),[3] and the Behavior Assessment System for Chil-
dren, Second Edition (BASC-II).[4] Cintron then attempted to
administer the Kaufman Test of Educational Achievement,

---

[2] The Type 73 license is the Illinois School Counselor Certification.

[3] WISC-IV is a full-scale IQ test designed for children between 6 and
16 years old.

[4] The BASC-II is an assessment intended to help "understand the be-
haviors and emotions of children and adolescents." See https://www.pear-
sonclinical.com/education/products/100000658/behavior-assessment-sys-
tem-for-children-second-edition-basc-2.html#tab-details (last visited Au-
gust 9, 2018).

Third Edition (KTEA-3),[5] but found B.G. to be uncooperative and the test results unreliable.

Cintron reviewed B.G.'s academic history, previous evaluations, and medical history. She also performed classroom observations in a general education class and in B.G.'s special education classroom. Cintron noted that B.G. had been hospitalized in May 2014 and diagnosed with morbid obesity, hypertension, and diabetes among other things. She also observed that B.G. was exhibiting some signs of depression after his father died around that same time and he had to move in with an aunt (his godmother) while his mother sought stable housing. Unfortunately, due to B.G.'s uncooperativeness, Cintron was unable to conduct an interview with him on two separate occasions.

After all this, Cintron composed a report for B.G.'s IEP team which the hearing officer deemed "comprehensive." Hearing Officer's Decision, Findings of Fact ¶ 42. Based on Cintron's report, the IEP team concluded B.G. was eligible for services under the emotional disability and special learning disability categories. The team also used Cintron's report to write goals for B.G. At the IEP meeting, the team shared the report with B.G.'s mother, who raised no objections.

As far as we can tell from the briefing, B.G. has eight main objections to the psychological assessment: (1) the psychologists were not sufficiently trained and knowledgeable; (2) errors in administering the assessments rendered them invalid,

---

[5] The KTEA-3 is "an individually administered measure of academic achievement from ages 4.5 through 25." See http://txautism.net/evaluations/kaufman-test-of-educational-achievement-third-edition-ktea-3 (last visited August 9, 2018).

and, relatedly, the District's failure (in his view) to assess whether B.G. has an intellectual disability; (3) the psychologists erred when they concluded that B.G. was an English speaker (and further erred by providing minimal Spanish translation on one of the tests administered); (4) the psychologists incorrectly thought B.G. was suffering from an emotional disability; (5) the assessment did not consider that B.G. might have had Attention Deficit Hyperactivity Disorder (ADHD); (6) Cintron entered the IEP meeting thinking that B.G. should no longer be classified as learning disabled; (7) the District failed to report certain academic data; and (8) Cintron's recommendations to the IEP team were erroneous. We consider these objections in turn and ultimately find that, in light of the record and factual findings by the hearing officer and the district court, none has merit.

### a. Qualifications and training

As noted above, Cintron and Coehlo possess all the traditional credentials and markers of individuals qualified to perform psychological evaluations. Nobody can question their their education, certifications, and years of experience. Yet B.G. contends that despite Cintron's training and experience, she lacked important knowledge that rendered her unqualified under 34 C.F.R. § 300.304(c)(1)(iv). As the District points out, however, B.G.'s claims are based on a selective reading of the record. For example, nothing B.G. cites indicates that Cintron had any "glaring" gaps of expertise with respect to reading. And B.G.'s citations do not support his claim that Cintron did not know the difference between phonemic awareness and phonics. In short, the record contains substantial evidence that Cintron (and Coehlo) had sufficient

knowledge, training, and experience to administer an assessment.

Further, we cannot fault the hearing officer for discounting the testimony of B.G.'s expert, Dr. Goldstein, that Cintron should have tried harder and used different methods to administer assessments to B.G. After all, Cintron knew B.G., while Dr. Goldstein had never met or evaluated him. Given that, it is understandable that the hearing officer thought Cintron's explanation was more persuasive than Dr. Goldstein's objections.[6]

### b. Intellectual disability and testing irregularities

B.G. argues that Cintron did not adequately consider whether his score on the WISC-IV indicated an intellectual disability. He takes issue with Cintron's conclusion that his drop in IQ evidenced by the two assessments was a result of either an emotional disability or depression caused by his father's death. Admittedly, B.G.'s 2014 IQ, according to the WISC-IV, was 71, just one point above the cutoff for an intellectual disability. But, as B.G.'s expert Dr. Goldstein acknowledged, B.G.'s 2009 WISC scores were much higher and not indicative of an intellectual disability. Administrative Record at 3118. Since B.G. had not experienced a head injury or other condition that would lead to such a drop in IQ, see *id.* at 3471, we cannot say the hearing officer was wrong to credit

---

[6] To the extent that B.G. argues Cintron should have done something different to assess his academic skills (such as math) because he was uncooperative during her attempt to assess the KTEA-3, the hearing officer's factual findings do not support his claim. See Hearing Officer's Decision, Findings of Fact ¶ 33–34 & p. 61.

Cintron's belief that something else—whether it be grief, depression, an emotional disability, or extended absences from school—had caused the drop in B.G.'s IQ score.[7]

B.G. relatedly argues that admitted mistakes in the administration of the WISC-IV and BASC-II rendered their results invalid. But here, too, substantial evidence supports the hearing officer's conclusion that these errors were harmless. The errors included Coehlo's decision to provide minimal Spanish translation while administering the WISC-IV, Cintron's failure to explain "f scores" on the BASC-II in her report, and Cintron's failure to consider B.G.'s results on the Vineland assessment administered by B.G.'s former special education teacher. The hearing officer credited the District's psychologists' testimony that these errors did not invalidate the results of the assessments (and the ultimate conclusion that B.G. did not have an intellectual disability). See Hearing Officer's Decision p. 62. Importantly, even Dr. Goldstein was not willing to state at the hearing that these errors invalidated the results.[8]

---

[7] Here, too, B.G.'s factual assertions are best described as a selective reading of the record. For example, B.G. faults the District for failing to report discrepancies between the Verbal Confirmation and other indices on the WISC-IV, but as the District points out, the cited portion of the transcript is Dr. Goldstein testifying about these very discrepancies. B.G. also charges that Coehlo's failure to administer subtests for visual closure rendered her assessments inadequate, but ignores that the District's occupational therapist did administer such a test. In any event, all of this is at the margins; the bottom line is that substantial evidence supports the hearing officer's conclusion that B.G. did not have an intellectual disability. Hearing Officer's Decision, Finding of Fact ¶ 38.

[8] B.G. contends that the hearing officer shifted the burden by requiring his expert to "definitively state" that the errors affected the results. That is not so. The hearing officer simply discounted Dr. Goldstein's testimony in part because of his unwillingness to go on the record to that effect. Finders

Hearing Officer's Decision, Findings of Fact ¶¶ 55, 57 & p. 62. In light of all this, we conclude that the hearing officer was within her discretion to credit the psychologists' assertions and discount Dr. Goldstein's testimony.

### c. Testing in English

B.G. next contends that the hearing officer erred by accepting the psychologists' conclusion that he was proficient in English. The upshot here is that if B.G. were tested in English even though he was not proficient in the language, the assessment might be racially or culturally biased. 34 C.F.R. 300.304(c)(1)(i). But the evidence supports the hearing officer's conclusion that English was the proper language in which to test B.G. Cintron knew from her review of B.G.'s records that he was no longer an English Language Learner and that he was instructed in and spoke English. Hearing Officer's Decision, Finding of Fact ¶ 37. Several of the District's other assessors testified that B.G. was proficient in English and preferred it to Spanish. See *id.* ¶¶ 63, 65, 67, 127, 171. And Dr. Goldstein agreed that if a student is proficient in English, the WISC-IV does not have a racial or cultural bias. *Id.* ¶ 55. Substantial evidence supports the hearing officer's conclusion that B.G. was proficient in, and indeed preferred, English. Thus, the hearing officer was correct that the testing was not racially or culturally biased.

Relatedly, B.G. contends that nonverbal IQ testing would have been more accurate. Cintron testified that nonverbal

---

of fact are entitled to do that without conducting unlawful burden shifting. Indeed, the hearing officer would have been entitled to discount Dr. Goldstein's testimony even if he had been unequivocal, since a competing explanation exists in the record.

testing is appropriate for students who are English Language Learners, but that designation no longer applied to B.G. *Id.* ¶ 37. Furthermore, Cintron and Coehlo had observed that B.G. was comfortable communicating in English; he responded only in English when Cintron asked him test questions. *Id.* Thus, the hearing officer had no reason to doubt the psychologists' assertion that B.G. was proficient in English and could be tested in that language.

### d. Emotional disability

B.G. next contends that he should not have been classified as a student with an emotional disability. He accuses the District's psychologists of conflating an emotional disability with the short-term effects of coping with his father's death. But it is unclear what the District could have done differently even if grief, and not a disability, were the primary cause of B.G.'s poor emotional indicators. As the District notes, B.G.'s mother demanded a publicly-funded IEE in this case; it was not practicable for the District to postpone its evaluation until B.G. was no longer grieving. And B.G.'s evaluation pointed towards emotional issues, as B.G. himself reported that he has desire for self-harm and always feels like his life is getting worse. See *id.* ¶ 30. B.G. also had very few friends at school and had already been held back a year. Combine this with his significantly falling IQ scores and we cannot say that the hearing officer erred by concluding that B.G. suffered from an emotional disability.

### e. ADHD

Next, B.G. claims that the psychologists ignored potential ADHD in their evaluations. ADHD is a medical diagnosis not within the area of expertise of the evaluators (or the hearing

officer), but the evidence suggests that the psychologists did consider the possibility of ADHD. As the district court noted, the hearing officer found that B.G.'s 2009 Psychological Evaluation Report, which indicated ADHD symptoms, was unreliable because it was out of date. *B.G. by J.A.G.*, 243 F. Supp. 3d at 982 (citing Hearing Officer's Decision, Finding of Fact ¶ 210). B.G.'s mother then had five years to follow up on the potential of ADHD, but she failed to do so. Without a diagnosis, there was nothing the District's psychologists could have done differently. They were not obliged to make a medical diagnosis during their evaluation of B.G.

### f. Cintron's opinion on B.G.'s learning disability

There is no question that Cintron believed that B.G.'s primary problem was either an emotional disability or his economic disadvantage and lack of attendance. Cintron found that B.G.'s attendance problem made it hard to assess whether he actually had a learning disability. But, contrary to B.G.'s assertion, Cintron did not recommend that B.G. lose access to audiobooks even if he were not classified as learning disabled. See Defendants' Appendix at 692. And the IEP team ultimately concluded that B.G. was eligible for services because he had a specific learning disability, see Hearing Officer's Decision at p. 61, so Cintron's beliefs did not factor into the final decision of the IEP team. It is hard to see what Cintron did wrong here; on the contrary, her reservations were quite reasonable. We find no error here.

### g. Failure to report academic data

B.G. argues that the District almost totally failed to report academic data, but the citations in his brief are limited to subtests that were not completed because B.G. proved uncooperative. Even Dr. Goldstein admitted that B.G. was not engaged in the process of testing and that the subtests of the KTEA that Cintron tried to administer were not necessary. Administrative Record at 3175–76, 3419. Moreover, even were we to credit B.G.'s position on the difficulty of testing him, IEP team member Uchenna Obialor performed a comprehensive "Learning Environment Screening" that included significant detail regarding B.G.'s academic weaknesses. See Defendants' Appendix at 699–704. We see no error with respect to the District's reporting of academic data.

### h. Cintron's recommendations

Finally, B.G. faults Cintron for failure to recommend to the IEP team that B.G. have a multisensory program and failure to specify how many instructors he needed and how long he should be instructed. But it was the IEP team, not Cintron herself, whose job it was to create educational goals for B.G. And the IEP team did write a goal to use "a systematic multi-sensory approach" with B.G to help him learn to decode unfamiliar words. Administrative Record at 759. Thus, the IEP team used Cintron's report to develop an apparently appropriate goal. We find no error.

### 2. Occupational Therapy Evaluation

Rebecca Cassidy, an outside contractor with the District who is employed by private rehabilitation facility Health Pro Rehabilitation, performed the District's occupational therapy evaluation of B.G. She has worked with the District for nearly

30 years, supervising the District's occupational therapists and providing professional development training. Cassidy holds a bachelor's degree in occupational therapy and is licensed in Illinois.

Cassidy evaluated B.G. on September 19, 2014. She observed B.G. in the classroom and followed him "through daily transitions, observing his sensory processing, movement, interaction with other students, and strategies to get from place to place." *B.G. by J.A.G.*, 243 F. Supp. 3d at 973 (citing Hearing Officer's Decision, Finding of Fact ¶ 116). She also saw that B.G. could access the school environment relatively easily and do basic self-help activities independently. Cassidy also evaluated B.G.'s writing through the McMasters Writing Assessment, finding that B.G. could legibly copy 50 letters per minute, an appropriate level for a sixth grader. But her attempt to administer the Visual Closure subtest of the Developmental Test of Visual Perception (DVPT-A) failed due to B.G.'s unwillingness to engage. Nevertheless, Cassidy was able to conclude that B.G. could write and type a bit slower than average for his age, although he had trouble putting his thoughts onto paper. She recommended the use of word prediction software and increased keyboarding practice to improve B.G.'s speed in performing work.

B.G. faults Cassidy for failing to assess his hygiene, but the record does not reveal that personal hygiene was a problem for B.G. at the time of the evaluation. Neither Cassidy nor any of the other District evaluators made any notes suggesting that B.G. appeared to be neglecting his personal hygiene. On the contrary, B.G. responded positively during a life-skills assessment he took around the time of the IEP meeting, noting that he brushed his teeth and bathed daily. Administrative

Record at 804. B.G.'s hygiene problems appear to have been in the past by the time he was evaluated. What is more, B.G. is incorrect that Cassidy testified at the hearing that she was unaware of hygiene concerns; as the district court explained, plaintiff's counsel never elicited such testimony. *B.G. by J.A.G.*, 243 F. Supp. 3d at 985–86 (citing Administrative Record at 2914). In short, the record does not support B.G.'s contention that Cassidy ignored hygiene issues. Nor does it support B.G.'s contention that Cassidy conducted a cursory evaluation. Substantial evidence supports the hearing officer's conclusions.

### 3. Social Work Evaluation

Jennifer Avilas conducted the District's social work evaluation. She had eighteen years of experience as a social worker for the District and holds a Bachelor's and Master's degree in Social Work and an Illinois type 73 license. Avilas is also fluent in Spanish. She interviewed B.G. in English (without concern) and B.G.'s mother in Spanish; B.G.'s mother indicated concerns that B.G. was unable to verbalize his frustrations. Avilas noted that B.G.'s family lived in a small apartment and received social welfare benefits.

Avilas also gave the Strengths and Difficulties Questionnaire to B.G.'s then-current and former special education teachers; the current teacher indicated a normal rating, but the former teacher provided answers indicating concern with B.G.'s lack of considering the feelings of others, ability to share, disruptive behavior, obedience, and work completion. She observed him in class on September 19, 2014, and noted that he was disruptive and refused to take direction.

Avilas' report recommended social-emotional accommodations be implemented for B.G. throughout the day. She also offered to provide B.G.'s mother with a list of professionals for B.G. to seek counseling for grief. Further, she agreed that B.G. had an emotional disability. B.G.'s mother, present at the IEP meeting, specifically noted that she agreed with Avilas' report.

B.G.'s first concern is that Avilas never conducted a home visit and so had no basis to conclude that he could do homework at home. But the hearing officer thought a home visit was not necessary given Avilas' interview with B.G.'s mother, who was deemed credible. Hearing Officer's Decision, Finding of Fact ¶ 178. This allowed Avilas to testify about B.G.'s living situation with sufficient specificity that a home visit was unnecessary. Avilas testified credibly that she had worked with families with ten children who manage to do their homework in a two room apartment. Administrative Record at 2849–50. The hearing officer was within her discretion to accept this testimony.

Next, B.G. questions the appropriateness of Avilas' Functional Behavior Assessment (or, as the district court put it, Functional Behavior Plan). See *B.G. by J.A.G.*, 243 F. Supp. 3d at 987. In the district court, B.G. cited only to the testimony of Dr. Goldstein, which the hearing officer had discounted because it did not consider him an expert in areas other than psychology. *Id.* The hearing officer instead credited Avilas' testimony that the Assessment was adequate and that her recommendations were based on appropriate research. See Administrative Record at 2791. Like the district court, we find no

reason to disturb the hearing officer's finding that Avilas conducted the Functional Behavior Assessment appropriately. The same is true for the entirety of the social work evaluation.

### 4. Physical Therapy Evaluation

Andrea Alter conducted the District's physical therapy evaluation of B.G. She holds a Doctorate in Physical Therapy from Boston University, is a licensed physical therapist in Illinois, and has worked for the District for three years. She evaluated B.G. on October 24, 2014, including observations during class, recess, lunch, and transition periods. Alter observed that B.G. could sit upright in class and was able to navigate the halls and stairs between classes. B.G. also demonstrated strong gross motor skills. He even participated in physical education class and met weekly with the school social worker for twenty minutes of interval circuit training.

Alter found B.G. had decreased endurance due to his weight and other medical conditions, but that this was not an issue for the short periods of movement required during the school day. Relatedly, Alter concluded that B.G. could independently access the education environment. While she recommended modifications to his physical education program, Alter ultimately concluded that B.G. did not need physical therapy services.

B.G. argues that Alter's assessment did not assess his pain or posture issues. With respect to pain: while the district court correctly pointed out the hearing officer's mistaken conclusion that Alter had ruled out pain, the court also observed that "there is actually no significant evidence that B.G. was, in fact, experiencing pain such that physical therapy was necessary." *B.G. by J.A.G.*, 243 F. Supp. 3d at 985. We agree with the district

court that the hearing officer's small error in this instance was harmless. As for posture, B.G. is simply incorrect that Alter ignored such concerns. He is also incorrect that Cassidy (the District's occupational therapist) noted posture issues; she actually concluded that B.G.'s penchant for leaning on his desk rather than sitting up was out of habit rather than a lack of strength. Administrative Record at 694. We agree with the district court that the hearing officer committed no error in finding the physical therapy evaluation appropriate.

### 5. Speech and Language Evaluation

Joeyllyn Martin performed the District's speech and language evaluation of B.G. She had 12 years of experience with the District, holds a graduate degree in Speech and Language Pathology, and is licensed in Illinois with a certification in clinical competence. Martin observed B.G. in September 2014; this observation included watching B.G. communicate with others in small and large groups as well as a one-on-one interview with him. She reported that B.G. was comfortable speaking English and able to maintain an appropriate conversation.

Martin also administered several assessments. Through the Oral Motor Assessment and an informal Voice Assessment, she found that B.G. "was functional for educational purposes." An Articulation Assessment revealed B.G.'s tendency to substitute the 'f' sound in place of 'th.' The Peabody Picture Vocabulary Test and the CASL showed that B.G. had "moderate deficits in receptive vocabulary." Martin did not believe B.G. had an issue with expressive vocabulary. She also chose not to perform the Mean Length of Utterance test, explaining at the hearing that research indicates it should not

typically be used for children B.G.'s age. B.G.'s expert Dr. Bailey substantially agreed. Administrative Record at 3543 (Dr. Bailey's testimony that "[a]s children age, traditional assessments of length of utterance with MLU become less talked about in the literature and less accurate as an indicator, because often times teenagers are able to give a whole lot of meaning with very short words."). Finally, Martin reviewed the results of the Lindamood-Bell assessment administered by an outside individual procured by B.G.'s mother, but found it somewhat unhelpful because the assessor did not provide an explanation of his or her findings.

Martin concluded that B.G. was impaired in receptive language and was eligible for speech services. While she lost the testing protocols for the CASL after the IEP meeting and was unable to produce them at the hearing, the hearing officer found that this did not invalidate the results because Martin's report was comprehensive, assessing B.G.'s needs and formulating speech and language goals. Hearing Officer's Decision, Finding of Fact ¶ 81. Finally, Martin declined to give an opinion on B.G.'s reading skills; she testified at the hearing that reading skills are beyond her area of expertise and that she would defer to the District's reading specialist.

B.G. argues that the hearing officer incorrectly found the lost CASL protocols to be harmless. But it is hard to see why Martin's misplacement of the protocols should invalidate the CASL results, much less Martin's entire evaluation. As the district court noted, B.G.'s CASL results corroborated the results of the Peabody Picture Vocabulary Test. *B.G. by J.A.G.*, 243 F. Supp. 3d at 972. Moreover, Martin had the protocols when she attended the IEP meeting, and still possessed the scores and other information in her report at the time of the

hearing. See Hearing Officer's Decision, Finding of Fact ¶ 81. It is unfortunate that she misplaced the protocols and could not produce them at the hearing, but we agree with the hearing officer and the district court that Martin's mistake did not doom the entire assessment.

B.G. argues that Martin was incapable of administering the CASL, but points to no useful evidence to support this allegation. Instead, B.G.'s argument is based on (1) an IEE conducted by Mari Lane which B.G.'s mother procured after the hearing; and (2) the psychologists' handling of the BASC-2 and WISC-IV assessments. The former piece of evidence is not in the record, see *supra* at 5, and the latter is irrelevant to the question whether *Martin* could administer the *CASL*.

B.G. also takes issue with Martin's decision not to test expressive vocabulary, but Martin felt no need to do so because B.G. did not have a problem finding the proper word to use in English. Hearing Officer's Decision, Finding of Fact ¶ 84. Given that Martin had interviewed and observed B.G., it was reasonable for the hearing officer to credit her testimony that an assessment was not necessary. Substantial evidence exists in the record to support the hearing officer's decision in this area.[9]

### III. Conclusion

This case involves a voluminous administrative record dealing with subject matter beyond the expertise of federal

---

[9] B.G.'s brief fails to develop arguments with respect to the Nursing and Assistive Technology assessments, so we find these arguments waived. *Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005). Absent wavier, we would agree with the district court that the hearing officer's conclusions on these assessments were supported by substantial evidence.

judges. That is why we defer to the hearing officer's factual findings and decline to substitute our own views on educational policy for the hearing officer's. The hearing officer in this case conducted a five-day hearing, heard the relevant evidence, and concluded that the District's experts evaluated B.G. appropriately. While B.G. presents many complaints about the District's evaluators, the record shows that the District's evaluators were competent, well-trained, and performed comprehensive evaluations. Particularly under the deferential standard of review applicable here, we have no cause to set aside the hearing officer's well-reasoned decision.

AFFIRMED